RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

YERVIN K. BARNETT,

        *Defendant-Appellant.*

No. 04-5252

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 02-20440—Bernice B. Donald, District Judge.

Argued: January 26, 2005

Decided and Filed: February 16, 2005

Before: BOGGS, Chief Judge; MARTIN, Circuit Judge; GWIN, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Stephen B. Shankman, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, for Appellant. David N. Pritchard, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Stephen B. Shankman, Needum L. Germany, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, for Appellant. David N. Pritchard, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

MARTIN, J., delivered the opinion of the court. GWIN, D. J. (pp. 13-15), delivered a separate concurring opinion. BOGGS, C. J. (pp. 16-20), delivered a separate opinion concurring in part and dissenting in part.

_____

### OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Yervin K. Barnett appeals his conviction and sentence for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). For the following reasons, we **AFFIRM** Barnett's conviction. However, we **VACATE** the sentence of the

_____

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

district court and **REMAND** for resentencing consistent with the Supreme Court's decision in *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005).

I.

In the early morning hours of July 4, 2002, Officer Corey Jefferson of the Memphis Police Department responded to a burglary call at 661 Shel Lane. When Jefferson arrived at the address, he flashed his spotlight at the residence and observed a black male kneeling in front of a window with a long black object in his hand (although Jefferson initially testified that he may have seen the suspect climbing out of the window). The suspect, upon seeing Jefferson, threw the object down and ran to a nearby car and drove away. Officer Jefferson gave pursuit. Jefferson testified that the object in the suspect's hand looked like a shotgun, but he was not sure. He further testified that he was able to get "a pretty good look" at the suspect as he ran toward the car. During the pursuit, the suspect lost control of his car on a curve and ran over a curb and into a house. He then began to flee on foot. Jefferson pursued the suspect on foot for a short period of time, until Jefferson was unable to jump a fence and lost sight of the suspect. Jefferson then radioed to other officers the location where he last saw the suspect and returned to his squad car in an effort to form a perimeter around the area.

Within ten minutes, Officer Jane Martin, a member of the department's canine unit, arrived on the scene and began searching the area. Martin's dog apparently followed a trail to a shed where Yervin Barnett was hiding. Martin took Barnett into custody. Jefferson testified that upon seeing Barnett detained, he was able to recognize Barnett as the same individual he observed at 661 Shel Lane earlier that evening crouched in front of the window with the long dark object in his hand. While Barnett was in custody at the scene, he apparently told the officers that he was not acting alone that night. In response, Jefferson testified that he told Barnett that he was the only one he saw at the scene.

Officer Tina Crowe testified that she responded to 661 Shel Lane to perform a crime scene investigation on July 4, 2002. During her investigation, she recovered a black and chrome rifle from the front yard of that address. At trial, Jefferson testified that the recovered gun featured in a picture (exhibit two) was the long black object that he saw the suspect holding in his hand.

The only witness called by the defense was Janice Bell. Bell testified that she was with Barnett on the evening of July 3 until around 11:00 p.m. or 12:00 a.m., and that Barnett had left in the presence of another man, James Molist, who subsequently died before trial.

At trial, the district court instructed the jury on the applicable law regarding possession of a firearm by a felon under 18 U.S.C. § 922(g). The court instructed:

> You should find that the Defendant had possession of the firearm, if he had control of it, even though it was not physically in his possession. But, it is not enough that the Defendant may have known about the firearm. A defendant possess [sic] a firearm only if he had control of it either alone or together with someone else. Next, I will talk about actual and constructive possession. Next, I want to explain something further about possession. The government does not necessarily have to prove that the Defendant physically possessed the firearm for you to find him guilty of this crime.

> The law recognizes two kinds of possession, actual possession and constructive possession. Either one of these, if proved by the Government, is enough to convict. To establish actual possession, the Government must prove that the Defendant had direct and physical control over the firearm and knew that he had control of it. To establish constructive possession, the Government must prove that the Defendant had

the right to exercise physical control over the firearm and knew that he had this right. And that he intended to exercise physical control over it at sometime either directly or through other persons. For example, if you left something with a friend intending to come back later to pick it up or intending to send someone else to come and pick it up for you, you would have constructive possession of that thing, while it was in the actual possession of your friend. But, understand that just being present where something is located does not equal possession. The Government must prove that the Defendant had actual or constructive possession of the firearm and knew that he did . . . .

Counsel for Barnett stated in closing argument:

We all know that people do burglaries when they are accompanied by other people. It could happen, right. We all know that every time a burglary happens, it is not just one person. It could be another person. . . . We also heard the statements made by Mr. Barnett given to Officer Jefferson. What did he tell you? Did you all catch anybody else? . . . Maybe, there was somebody else. Maybe there was. What did Officer Jefferson say? He didn't look for another person. Well, yes. I guess that there could have been somebody else . . . .

You heard the testimony of Janice Bell. Janice Bell said, that Mr. Barnett was accompanied by another man. His name was James Molist. And I submitted his death certificate in this case. At 11:00 at night, 11:00 or 12:00 o'clock at night, that's pretty late. You remember the burglary happened about around 4:00, just a few hours later. I submit to you, that it is possible, that Mr. Molist was with Mr. Barnett that night. And that was possibly the other person.

In rebuttal closing, counsel for the United States stated:

So, if you conspire with someone else to go and kick in the front door of a citizen's home, and invade that home, and take property from that home, without the permission of the homeowner or either you or your partner decide to grab a rifle from the home, then, both of you, under the law, have exercised control over it.

The defense objected and the district court sustained the objection to the use of the word "conspiracy," as there was no conspiracy charge in the case. The court instructed the jury to disregard anything the prosecutor said about conspiracy and that line of argument. Counsel for the United States did not use the word "conspiracy" again in commenting on the defense theory of the case.

Returning to his closing, counsel for the United States again argued: "If you and Mr. Molist, the Defendant and Mr. Molist, went to the home and broke into the home; and let's say that, it was Mr. Molist, who had the gun, the Defendant is still responsible." Counsel for Barnett again objected. In a side bar, the court responded to the government's argument: "Those are facts, that are not in evidence. There is no evidence, anything in the record. . . . [D]o we know that these were the two that did that? You didn't argue that on Direct." During the course of this bench conference, counsel for Barnett admitted that he had argued the theory that Molist, rather than Barnett, had been in possession of the firearm at the time of the apparent burglary. With the court's permission, counsel for the United States continued his closing by responding to the defense's argument as follows: "Just, hypothetically, if two people broke into a home, and one of them possessed the gun, and then under this law, as the Judge has read it to you, both can be charged with possession of it. Because if your partner exercises control and possession, controlling possession, hypothetically, then, you do as well, under the law, as has been instructed to you by Her Honor."

On November 6, 2003, the jury convicted Barnett of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). At the sentencing hearing on February 25, 2004, the district court calculated Barnett's base offense level under the United States Sentencing Guidelines for "felon in possession of a firearm" to be 24 under section 2K2.1, but then added 2 points for his possession of a stolen firearm under section 2K2.1(b)(4), and 2 more points for reckless endangerment during flight under section 3C1.2. This yielded an adjusted offense level of 28. However, because Barnett had been convicted of at least three aggravated or violent felonies in the past, the district court was required to sentence him as an armed career criminal, which increased his offense level to 33 under section 4B1.4 of the Guidelines and imposed a statutory mandatory minimum of 180 months of imprisonment, *see* 18 U.S.C. § 924(e). With a criminal history category of VI, and an offense level of 33, the Guidelines required the district court to sentence Barnett within the Guidelines range of 235-292 months of imprisonment. Counsel for the United States requested sentencing in the upper end of the range, while Barnett requested a sentence in the low end. In sentencing Barnett to 265 months of imprisonment, in the middle of the range, the court stated:

> Mr. Barnett, in this case, while this is a firearms case, looking back at your criminal history, there are five aggravated burglary convictions in your past. Those are very serious matters. The jury found you guilty of this offense. You are a career offender. The court finds that the low end of the guideline is not appropriate in this case. The court is going to sentence you to 265 months on this matter. . . . But that is going to be the court's sentence, that is a sentence a little bit over 22 years, and I believe that that is appropriate under the totality of the circumstances in this case, that is going to be the court's sentence, Mr. Barnett.

There was no objection to the district court's calculations of the appropriate Guidelines range at the sentencing hearing.

## II.

On appeal, Barnett seeks reversal of his conviction, alleging insufficiency of the evidence and prosecutorial misconduct. He also seeks remand for resentencing in light of the Supreme Court's recent decision in *United States v. Booker*. We first consider the appeal of Barnett's conviction and then address whether his sentence should be vacated and remanded for resentencing.

## A.

Barnett's first argument on appeal is that the evidence submitted at trial was constitutionally insufficient to sustain the jury's verdict finding him guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Barnett claims that the only witness who testified that he had actually seen Barnett with the gun was Officer Jefferson who, according to Barnett, testified inconsistently "throughout the course of the trial." Because of these "inconsistences," Barnett argues that "no reasonable juror could have believed Officer Jefferson," and, therefore, there is insufficient evidence to sustain the jury's verdict.

When a conviction is attacked for insufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecution to determine whether any rational trier of fact could have found each essential element of the offense beyond a reasonable doubt. *Hilliard v. United States*, 157 F.3d 444, 447 (6th Cir. 1998). This Court reverses a judgment for insufficiency of the evidence "only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 745 (6th Cir. 1999).

We are convinced that Barnett's conviction was based on "substantial and competent evidence." Officer Jefferson testified at trial that he saw Barnett crouched outside the residence at 661 Shel Lane, holding a long black object that looked like a shotgun. He further testified that he saw Barnett throw the object to the ground as Barnett began to flee from the residence. Furthermore, Officer Crowe testified that upon investigating the residence after Barnett was apprehended, she found a black and chrome rifle in the front yard. This evidence is sufficient evidence to support the jury's guilty verdict.

Barnett claims that because Officer Jefferson's testimony was, in his view, inconsistent and unreliable, the government did not present sufficient evidence to sustain the guilty verdict. We disagree. This Court has consistently stated that "[i]n cases in which we assess the sufficiency of the evidence, we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994) (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)). Barnett makes no substantive argument that the evidence submitted to the jury was insufficient; rather, he merely argues that Jefferson cannot be believed. Consequently, we find that Barnett's argument "is merely a challenge to [the witness's] credibility, packaged as an insufficiency of the evidence claim." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). Thus, because "attacks on witness credibility are simply challenges to the *quality* of the government's evidence and not to the sufficiency of the evidence," *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984) (emphasis in original), Barnett's challenge to his conviction on this ground must fail.

B.

Barnett also seeks reversal of his conviction based on the prosecutor's closing argument at trial, which, according to Barnett, included misstatements of the law and consequently amounted to prosecutorial misconduct. Allegations of prosecutorial misconduct contain mixed questions of law and fact that this Court reviews de novo. *United States v. Green*, 305 F.3d 422, 429 (6th Cir. 2002). In reviewing allegations of prosecutorial misconduct, this Court conducts a two-step inquiry. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). First, we determine if the statements were improper. *Id.* If they were improper, we consider the following factors to determine if the comments were flagrant enough to warrant reversal: (1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused. *Id.*

We begin, and end, our analysis of Barnett's prosecutorial misconduct claim by considering whether the prosecutor's closing argument was improper. In determining whether it was improper, we "view the conduct at issue within the context of the trial as a whole." *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004) (citing *United States v. Young*, 470 U.S. 1, 12 (1985)). When reviewing the conduct at issue, "[i]t is also appropriate to consider whether, and to what extent, a prosecutor's improper argument is invited by defense counsel's statements." *United States v. Jacobs*, 244 F.3d 503, 508 (6th Cir. 2001) (citing *United States v. Hickey*, 917 F.2d 901, 905 (6th Cir. 1990)).

In this case, the alleged prosecutorial misconduct involves the prosecutor's "continued insistence during rebuttal to instruct the jury on the law of conspiracy." In closing argument, counsel for the Untied States said that "if you conspire with someone else to . . . invade [a] home, or either you or your partner decide to grab a rifle from the home, then both you of under the law have exercised control over it." The district court sustained Barnett's objection to the use of the word "conspiracy," and instructed the jury to disregard the government's arguments regarding conspiracy on the ground that it was not an element of the charge. The prosecutor then continued, essentially saying the same thing, but without using the word "conspiracy." Counsel for Barnett

again objected, although in a side bar he admitted that the prosecutor was merely responding to defense counsel's argument that someone other than Barnett could have been holding the gun. Upon hearing that, the court allowed the prosecution to make its argument using the hypothetical quoted above.

We find that the prosecutor did not engage in misconduct. The prosecutor only mentioned "conspiracy" once in closing argument. The court, however, sustained Barnett's objection to the use of the word "conspiracy" and expressly admonished the jury regarding this statement, instructing them to disregard "anything [the prosecutor] said about conspiracy." This cured any possible impropriety of the prosecutor's use of the word "conspiracy." *See United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997). The subsequent statements, none of which used the word "conspiracy," were not improper. They simply responded to Barnett's theory of the case—namely, that someone other than Barnett had possession of the gun. Barnett points to no case law suggesting that the government's statements—legitimately responding to the defense's theory during closing arguments—were improper. In fact, this Court has held that rebuttal statements that similarly respond to a defendant's closing argument are not prosecutorial misconduct. *See, e.g., Jacobs*, 244 at 508 (holding that a prosecutor did not commit misconduct since defense counsel "opened the door" to prosecution rebuttal by arguing facts not in the record); *Monus*, 128 F.3d at 394 (holding that a prosecutor's hypothetical questions to the jury in response to defense argument were proper).

While Barnett claims that the prosecutor's statements were legally incorrect, he fails to provide support for this proposition. It is well-established that actual or constructive possession of a firearm is sufficient to give rise to liability under section 922(g). *See, e.g., United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004) (quoting *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003)). Thus, for the aforementioned reasons, we are convinced that the prosecutor's closing argument does not constitute prosecutorial misconduct.

III.

While this case was pending on appeal before this Court, the Supreme Court issued its decision in *United States v. Booker*. The Court issued two opinions in *Booker*, one authored by Justice Stevens concerning the merits of the constitutional challenge, and the other authored by Justice Breyer addressing the necessary remedy for what the Court found to be a constitutional violation. In Justice Breyer's opinion, the Court expressly severed and excised 18 U.S.C. § 3553(b)(1), which had required sentencing courts to impose a sentence within the applicable Sentencing Guidelines range, subject to departures in certain limited cases. *Booker*, 125 S. Ct. at 765. Consequently, under *Booker*, the Sentencing Guidelines are now advisory in all cases, including those that do not involve a Sixth Amendment violation. *Id.* at 769. In so holding, the Court expressly stated that its "remedial interpretation of the Sentencing Act" must be applied "to all cases on direct review." *Id.* The *Booker* Court made it clear that this remedial scheme should apply not only to those defendants whose sentences had been imposed in violation of the Sixth Amendment, but also to those defendants who had been sentenced under the mandatory Guidelines without suffering a Sixth Amendment violation. *Id.* at 765 (noting that while defendant Fanfan's sentence did not violate the Sixth Amendment, the parties could seek resentencing under the new advisory regime); *see United States v. Davis*, Nos. 02-4521, 03-1130, 03-1160, 2005 WL 334370, at *8 (3d Cir. Feb. 11, 2005) (remanding for resentencing under *Booker* despite absence of Sixth Amendment violation). Because this case was pending on direct review when *Booker* was decided, the holdings of *Booker* are applicable in the case at bar.

A.

Barnett first argues that the application of the Armed Career Criminal Act, 18 U.S.C. § 924(e), in this case violated the Sixth Amendment principles established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and reiterated in *Blakely v. Washington*, 542 U.S. __, 124 S. Ct. 2531 (2004), and *Booker* because the trial judge, rather than the jury, determined the nature of Barnett's previous convictions. According to Barnett, the government was required to plead in the indictment "every fact . . . used to increase [Barnett's] sentence above the statutory maximum, . . . [such as] whether or not the defendant's prior convictions were for crimes of violence or [for] controlled substances offenses."

Existing case law establishes that *Apprendi* does not require the nature or character of prior convictions to be determined by a jury. In *Apprendi*, the Supreme Court expressly excepted the fact of a prior conviction from the rule requiring issues of fact that increase a defendant's penalty to be submitted to the jury. 530 U.S. at 490. This Court, among others, has rejected the argument that *Apprendi* requires the nature of prior convictions to be determined by a jury, holding instead that the district court's authority to determine the existence of prior convictions was broad enough to include determinations regarding the nature of those prior convictions. For example, in *United States v. Becerra-Garcia*, 28 Fed. Appx. 381, No. 99-6205, 2002 WL 22038, at *3-5 (6th Cir. Jan. 2, 2002) (unpublished opinion), a panel of this Court held that a district court did not violate *Apprendi*'s Sixth Amendment holding by determining whether the defendant's prior conviction was for an aggravated felony. In *Becerra-Garcia*, we cited a number of courts that have reached similar conclusions, such as the Eighth Circuit, which, in *United States v. Campbell*, 270 F.3d 702, 707-09 (8th Cir. 2001), held that *Apprendi* does not require the nature of a defendant's prior felony offenses as "violent felonies" or "serious drug offenses" under the Armed Career Criminal Act to be proved to a jury.

In the present case, Barnett, like the defendant in *Campbell*, claims that the failure of the district court to submit to the jury the question of the nature of his prior convictions under the Armed Career Criminal Act violated *Apprendi*. Given the case law establishing that *Apprendi* does not require the nature of prior convictions to be determined by a jury, we reject Barnett's argument on this issue. Moreover, there is no language in *Booker* suggesting that the Supreme Court, as part of its remedial scheme adopted in that case, intended to alter the exception to *Apprendi* allowing district courts to consider the fact and nature of prior convictions without submitting those issues to the jury. Thus, for the foregoing reasons, we hold that there was no Sixth Amendment violation in the present case.

B.

Barnett's second argument is that given the Supreme Court's decision in *Booker* making the Sentencing Guidelines advisory, this Court should vacate his sentence and remand the case for resentencing "in light of the fact that the district court judge was sentencing the defendant as if the guidelines were mandatory." For the following reasons, we agree.

The parties conceded at oral argument that Barnett did not challenge his sentence on this or any other ground before the district court. Therefore, we review the district court's decision for plain error. *See Booker*, 125 S. Ct. at 769 (noting that whether a new sentencing hearing is required depends on "ordinary prudential doctrines," such as "whether the issue was raised below and whether it fails the 'plain-error' test"). In reviewing for plain error, we must consider whether there was plain error that affects substantial rights and that, in our discretionary view, seriously affects the fundamental fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466 (1997) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).

1.

We first consider whether there was error under current law. *United States v. Rogers*, 118 F.3d 466, 471-72 (6th Cir. 1997). In the instant case, Barnett was sentenced under the pre-*Booker* mandatory Sentencing Guidelines. The district court sentenced Barnett to 265 months of imprisonment followed by four years of supervised release, which fell within the Guidelines range of 235-292 months as required by 18 U.S.C. § 3553(b)(1). This sentencing procedure was correct at the time, but now, because section 3553(b)(1) has been excised and severed under *Booker*, the district court erred by treating the Guidelines as mandatory when it sentenced Barnett. Thus, the first requirement for finding plain error is satisfied in the present case.

2.

The next issue is whether the error was "plain." In this context, "'[p]lain' is synonymous with 'clear or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 733-34. The Supreme Court has expressly held that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal . . . it is enough that an error be plain at the time of appellate consideration." *Johnson*, 520 U.S. at 468; *accord United States v. Calloway*, 116 F.3d 1129, 1136 (6th Cir. 1997). In the present case, at the time Barnett was sentenced, the Sentencing Guidelines were mandatory and not, as they are now, advisory. Furthermore, controlling case law pre-*Booker* consistently held that the Sentencing Guidelines were constitutional and mandatory even after the uncertainty occasioned by the Supreme Court's decision in *Blakely*. *See, e.g., United States v. Koch*, 383 F.3d 436 (6th Cir. 2004) (en banc), *overruled by Booker*, 125 S. Ct. at 769. *Booker*, however, effectuated a "clear" and "obvious" change in law by making the Sentencing Guidelines advisory. Given this change in the law, we hold that it was plain error for Barnett to be sentenced under a mandatory Guidelines regime that has now become advisory.

3.

Third, the defendant is required to demonstrate that the plain error "affect[ed] substantial rights." Fed. R. Crim. P. 52(b); *Olano*, 507 U.S. at 734. As the Supreme Court reiterated in *United States v. Cotton*, 535 U.S. 625, 632 (2002) (quoting *Olano*, 507 U.S. at 734) (emphasis added), the phrase "affect substantial rights" is generally synonymous with "prejudicial," which "*usually* means that the error 'must have affected the outcome of the district court proceedings.'" However, the Supreme Court has noted, and this Circuit has recognized, two exceptions to the requirement that the defendant demonstrate that the error "affected the outcome of the district court proceedings." First, there is a class of so-called "structural" errors, which, the Supreme Court has instructed, "can be corrected regardless of their effect on the outcome." *Olano*, 507 U.S. at 735. "A 'structural' error "is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Johnson*, 520 U.S. at 468 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). The Supreme Court has found "structural errors only in a very limited class of cases," *id.*, such as where a defendant is denied certain fundamental rights, including the right to a public trial, *Waller v. Georgia*, 467 U.S. 39 (1984), the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168 (1984), and the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335 (1963). In such cases, because the error was "structural," the defendant was not required to demonstrate that he was prejudiced, or, in other words, that the error affected the outcome of the district court proceedings.

Second, the Supreme Court's decision in *Olano* "made it quite clear that in some situations a presumption of prejudice is appropriate" if the defendant cannot make a specific showing of prejudice. *Manning v. Huffman*, 269 F.3d 720, 726 (6th Cir. 2001) (holding that a presumption of prejudice was appropriate in a habeas case where an alternate juror participated in jury deliberations, even absent evidence that the error affected the jury's deliberations and its verdict); *United States*

*v. Segines*, 17 F.3d 847, 852 (6th Cir. 1994) (noting that "[t]he Supreme Court has stopped short . . . of establishing a blanket rule that shifts the burden of persuasion on the defendant in all cases. . . . [There also may be] 'errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice.'") (quoting *Olano*, 507 U.S. at 735).

Courts have presumed prejudice, and have thus found the third prong of plain error review satisfied, in cases where the inherent nature of the error made it exceptionally difficult for the defendant to demonstrate that the outcome of the lower court proceeding would have been different had the error not occurred. For instance, in *United States v. Adams*, 252 F.3d 276, 287 (3d Cir. 2001), the Third Circuit found plain error where the defendant was not given the opportunity to exercise his right of allocution. In considering whether the defendant could show that the court's error was prejudicial, the court expressly noted the difficulty in establishing that the allocution error affected the outcome of the district court proceedings. *See id.* ("In order to prove that the error actually 'affected the outcome of the district court proceedings,' [the defendant] would have to point to statements that he would have made at sentencing, and somehow show that these statements would have changed the sentence imposed by the District Court."). Because of "the nature of the right and the difficulty of proving prejudice from its violation," *id.* at 287, the court concluded that it would presume prejudice rather than require the defendant to make the "enormously difficult" showing that the error affected the district court's sentencing decision, *id.* (quoting *United States v. Alba Pagan*, 33 F.3d 125, 130 (1st Cir. 1994)) (internal quotation marks omitted). This Court reached a similar result in *United States v. Riascos-Suarez*, 73 F.3d 616, 627 (6th Cir. 1996), where we remanded for resentencing because the defendant was not afforded the opportunity to allocute and the error "could have had an effect on his sentence." *See also United States v. Cole*, 27 F.3d 996, 999 (4th Cir. 1994) (implicitly adopting presumption of prejudice in plain error context where a defendant was denied his right to allocute and, thus, "may have been able to persuade the court" that a lower sentence was appropriate). The continued validity of *Olano*'s category of "presumed prejudicial" errors was recently reaffirmed by the Fifth Circuit sitting en banc in *United States v. Reyna*, 358 F.3d 344, 351-52 (5th Cir.), *cert. denied*, 124 S. Ct. 2390 (2004), where the court held that it would presume that a defendant suffered prejudice from a court's failure to allow him to allocute, despite the defendant's inability to demonstrate how the error affected the sentence imposed by the district court.

In addition to the allocution context, courts have been willing to presume prejudice, both implicitly and explicitly, in plain error review of other types of errors that, by their nature, keep the party from being able to demonstrate that, in the absence of that error, the outcome of his trial or sentence would have been different. For example, in *United States v. Plaza-Garcia*, 914 F.2d 345, 347-48 (1st Cir. 1990), then-Chief Judge Stephen Breyer vacated a sentence that fell within both erroneously applied and correct Guideline ranges under the plain error doctrine because the sentence "may well have been influenced by the [erroneous] sentencing recommendation." *See also United States v. Syme*, 276 F.3d 131, 153-55 (3d Cir. 2002) (holding that even though a constructive amendment to an indictment does not constitute a "structural" error, it nevertheless must be "presumed prejudicial" in light of the difficulty of proving prejudice resulting from constructive amendments).

As established above, the plain error in the instant case is that the sentencing court failed to treat the Sentencing Guidelines as advisory in determining Barnett's sentence. The record shows that the district court imposed a sentence based on the assumption—which, again, was correct at the time but incorrect in light of *Booker*—that the Guidelines were mandatory. We are convinced that this is an appropriate case in which to presume prejudice under the Supreme Court's decision in *Olano*. First, if the district court in this case had not been bound by the range prescribed in the Guidelines, Barnett may have received a lower sentence. It is uncontested that the district court would have had the discretion, under the new advisory Guidelines regime, to impose a sentence as low as 180 months of imprisonment, the statutory minimum provided by the Armed Career Criminal

Act, 18 U.S.C. § 924(e), which is significantly lower than the 265 months he received under the application of the mandatory Guidelines.

Second, it would be exceedingly difficult for a defendant, such as Barnett, to show that his sentence would have been different if the district court had sentenced him under the advisory, rather than the mandatory, Guidelines framework. This is true in part because of the fundamental alteration of the sentencing process brought about by *Booker*'s remedial holding. Under the new post-*Booker* framework, the district court is empowered with greater discretion to consider the factors provided in 18 U.S.C. § 3553(a) in determining a proper sentence. This discretion was not present at the time Barnett was sentenced under the mandatory Guidelines. As the Second Circuit recently observed, it is "impossible to tell what considerations counsel for both sides might have brought to the sentencing judge's attention had they known that they could urge the judge to impose a non-Guidelines sentence." *United States v. Crosby*, No. 03-1675, slip op. at 28-29 (2d Cir. Feb. 2, 2005). Under the new post-*Booker* framework, counsel are now able to present aggravating and mitigating circumstances "that existed at the time [of pre-*Booker* sentencing] but were not available for consideration under the mandatory Guidelines regime." *Id.* at 35.

This fundamental difference between the pre- and post-*Booker* sentencing frameworks illustrates our deep concern with speculating, based merely on a middle-of the-range sentence imposed under the mandatory Guidelines framework, that the district court would not have sentenced Barnett to a lower sentence under the advisory Guidelines regime. That the district court chose to sentence Barnett in the middle of that mandatory range does not necessarily suggest that the district court would now feel that 265 months of imprisonment is the proper sentence for Barnett. Nor does it suggest that the court would not have sentenced Barnett to a lower sentence if it had the discretion, which it does now, to apply the Guidelines in an advisory fashion.

The extraordinary difficulty facing defendants such as Barnett in showing that the use of mandatory, rather than advisory, Guidelines affected the outcome of their sentencing proceedings is exacerbated by the fact that to make such a showing, the defendants would presumably have to demonstrate that the district court somehow intimated that it felt constrained by the Guidelines or that it would have preferred to sentence the defendant to a lower sentence. This, in our view, is too exacting a burden, given the fact that this Court, along with others, had repeatedly instructed sentencing courts pre-*Booker* to impose sentences within the applicable mandatory Guidelines range, with limited exceptions, and had consistently upheld the constitutionality of the Guidelines and their mandatory nature, even after the Supreme Court's decision in *Blakely*. *See, e.g., Koch*, 383 F.3d at 440 (noting that "our Circuit has consistently turned back Sixth Amendment challenges to Guideline enhancements so long as the resulting sentence falls below the congressionally-prescribed statutory maximum"), *overruled by Booker*, 125 S. Ct. at 769. This well-established case law substantially undermined any need or incentive for sentencing courts pre-*Booker* to note their objections and reservations in sentencing defendants under the then-mandatory Guidelines. It would be improper for this Court now to require defendants such as Barnett to produce this type of evidence—that sentencing courts had no reason to provide under our pre-*Booker* case law—in order to establish that their substantial rights have been affected.

As the Fourth Circuit recently noted, in sentencing under the mandatory Guidelines, "the district court was never called upon to impose a sentence in the exercise of its discretion. . . . We simply do not know how the district court would have sentenced [the defendant] had it been operating under the regime established by *Booker*." *United States v. Hughes*, No. 03-4172, 2005 WL 147059, at *5 n.8 (4th Cir. Jan. 24, 2005). Instead of speculating as to the district court's intentions in the pre-*Booker* world, and trying to apply those intentions to predict the same court's sentence under the post-*Booker* scheme, we are convinced that the most prudent course of action in this case is to presume prejudice given the distinct possibility that the district court would have

imposed a lower sentence under the new post-*Booker* framework and the onerous burden he would face in attempting to establish that the sentencing court would have imposed such a sentence.

This is not to discount the possibility, however, that in other cases the evidence in the record will be sufficient to rebut the presumption of prejudice. While "an appellate court will normally be unable to assess the significance of any [sentencing] error that might have been made," *Crosby*, slip op. at 35, we can imagine cases where the trial record contains clear and specific evidence that the district court would not have, in any event, sentenced the defendant to a lower sentence under an advisory Guidelines regime. *See Crosby*, slip op. at 35 (noting that "an educated guess as to the likely outcome of a remand . . . might be wrong, absent a *clear indication* at the original sentencing supporting the inference that the same sentence would have been imposed under the post-*Booker/Fanfan* regime") (emphasis added). This, however, is not one of those cases. While the dissent claims that there is "concrete," "affirmative," and "ample" evidence indicating that the district court would not give Barnett a lower sentence on remand under the post-*Booker* framework, the only evidence that the dissent cites for this proposition is the district court's middle-of-the-range sentence imposed under the mandatory Guidelines regime. This, in our view, is insufficient to rebut the presumption that Barnett was prejudiced by the imposition of a sentence under the mandatory Guidelines.

In summary, because Barnett has demonstrated that he was sentenced under the Sentencing Guidelines as if they were mandatory, rather than advisory, and because he has shown that the district court might have exercised its discretion to impose a lower sentence had it known that the Guidelines were advisory, we hold that Barnett's substantial rights have been affected.

4.

"The final step in plain error analysis is to determine whether this case warrants the exercise of our discretion." *Rogers*, 118 F.3d at 473. We correct plain errors affecting substantial rights in those cases where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936).

We conclude that an exercise of our discretion is appropriate in the present case. Barnett's sentence was imposed under a framework that has now been substantially altered by *Booker*'s severing and excising of 18 U.S.C. § 3553(b)(1), the provision that made the Guidelines mandatory. In our view, it would be fundamentally unfair to allow Barnett's sentence, imposed under a mandatory Guidelines regime, to stand in light of this substantial development in, and alteration of, the applicable legal framework. The better course, we believe, is to vacate Barnett's sentence and remand for resentencing, thus affording the district court the opportunity to re-sentence him in the first instance. "We would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [the defendant] the same sentence post-*Booker*." *United States v. Oliver*, No. 03-2126, 2005 WL 233779, at *8 n.3 (6th Cir. Feb. 2, 2005); *see Williams v. United States*, 503 U.S. 193, 205 (1992) ("[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.") (quoting *Solem v. Helm*, 463 U.S. 277, 290 n.16 (1983)).

Furthermore, we decline to consider the reasonableness of Barnett's sentence imposed under the Guidelines without first giving the district court the opportunity to re-sentence Barnett under the new post-*Booker* framework. As the Fourth Circuit recently stated:

> In determining whether the exercise of our discretion is warranted, it is not enough for us to say that the sentence imposed by the district court is reasonable irrespective of error. The fact remains that a sentence has yet to be imposed under a regime in which the guidelines are treated as advisory. To leave standing this sentence simply

because it may happen to fall within the range of reasonableness unquestionably impugns the fairness, integrity, or public reputation of judicial proceedings. . . . This is so because the district court was never called upon to impose a sentence in the exercise of its discretion. That the particular sentence imposed here might be reasonable is not to say that the district court, now vested with broader sentencing discretion, could not have imposed a different sentence that might also have been reasonable.

*Hughes*, 2005 WL 147059, at *5 n.8; *accord Crosby*, slip op. at 28 ("Even if reasonable as to length, a sentence unreasonable for legal error in the method of its selection is cause for concern because, in many cases, it will be impossible to tell whether the judge would have imposed the same sentence had the judge not felt compelled to impose a Guidelines sentence."). Because we are convinced that sentencing Barnett under mandatory Guidelines "seriously affect[ed] the fairness, integrity [and] public reputation of judicial proceedings," *Atkinson*, 297 U.S. at 160, now that we know those Guidelines are advisory, we exercise our discretion to notice the plain sentencing error in the present case and vacate Barnett's sentence.

## C.

We note briefly that because we have concluded that the district court committed plain error in this case, that error cannot constitute "harmless error." An error may be harmless only where the government is able to prove that none of the defendant's substantial rights has been affected by the error. *See* Fed. R. Crim. P. 52(a). Because this Court has determined that the error in this case affected Barnett's substantial rights, the government, therefore, is unable to establish that the error was harmless.

## IV.

For the reasons stated herein, we **AFFIRM** Barnett's conviction, but **VACATE** Barnett's sentence and **REMAND** for resentencing consistent with this opinion and with the Supreme Court's decision in *Booker*.

---

## CONCURRENCE

---

GWIN, District Judge concurring. I concur in the Court's opinion, but I write separately to speak to additional considerations.

In addition to the majority's reasons offered for remand, two additional considerations warrant remand. First, 18 U.S.C. § 3742(f)(1) bolsters our decision to remand Barnett's case for resentencing. This statute instructs when the court of appeals shall remand for error in applying the Guidelines. Section 3742(f)(1) states: "If the court of appeals determines that . . . the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court *shall remand* the case for further sentencing proceedings with such instructions as the court considers appropriate." 18 U.S.C. § 3742(f)(1) (emphasis added). Section 3742(f)(1) survives *Booker,*[1] and it suggests that remand for resentencing is appropriate when the district court errs in applying the Guidelines. The Supreme Court has construed Section 3742(f)(1) concerning the circumstances for remanding for resentencing. *See Williams v. United States*, 503 U.S. 193, 203 (1992).

In *Williams*, the Supreme Court stated that "remand is required only if the sentence was imposed as a result of an incorrect application of the Guidelines." *Id*. at 202-03 (internal quotation marks and emphasis omitted). Although the cases after *Williams* arose in the context of harmless error and not plain error, we interpreted the Supreme Court's decision in *Williams* as establishing that "remand [is] appropriate . . . unless [the] party defending [the] sentence convinces [the] court that [the] district court would have imposed [the] same sentence absent misapplication of guideline." *United States v. Parrott*, 148 F.3d 629, 636 (6th Cir. 1998); *see also United States v. Vandeberg*, 201 F.3d 805, 812 (6th Cir. 2000) ("Remand is appropriate unless the appellate court is convinced that the trial court would have imposed the same sentence absent [its] misinterpretation of the guideline.") (internal quotation marks omitted).

Because of the posture of Barnett's appeal, the cases interpreting Section 3742(f)(1) are more persuasive. Barnett was sentenced before the Supreme Court's decisions in *Blakely* and *Booker*. At the time Barnett was sentenced, all controlling authority suggested that any challenge to the mandatory application of the Guidelines would fail. Not surprisingly, Barnett's counsel raised no argument that the mandatory application of the Guidelines was error.

The district court found Barnett to be an armed career criminal under 18 U.S.C. § 924(e). The Guidelines caused Barnett's base offense level to be set at 33 based upon criminal history, U.S.S.G. § 4B1.4. Without his criminal history, Barnett's offense level, after adjustments, was 28. As the majority points out, this finding of criminal history did not implicate the Sixth Amendment even though it had a major impact upon the sentence that Barnett faced. Because the Sixth Amendment was not involved, Barnett had no reason to object under *Apprendi*. Finally, the record shows that the district judge felt constrained by the Guidelines, which required her to sentence within offense level 33. While the record is sparse on the district judge's reasons for imposing the sentence of 265 months, the record does show that the district judge selected offense level 33 solely because of the mandatory nature of the Guidelines.

Cases interpreting Section 3742(f)(1) further suggest that remand is appropriate. In remanding one case, we observed, "Hence, there is a possibility that the district court's ultimate

---

[1]In *Booker*, the Supreme Court excised 18 U.S.C. § 3742(e), which governed our standard of review.

conclusion was influenced by its misunderstanding of its sentencing options." *United States v. Schray*, 383 F.3d 430, 434 (6th Cir. 2004) (remanding and concluding no harmless error); *accord Kelly v. United States*, 29 F.3d 1107, 1111 (7th Cir. 1994) ("But absent an express statement that the court would impose the same sentence even if a different range were applicable, it is difficult to imagine a case in which an appeals court could declare with the requisite degree of confidence that the application of an incorrect range would amount to harmless error."), *overruled on other grounds*, *United States v. Ceballos*, 302 F.3d 679, 690-91 (7th Cir. 2002).

Given the substantial change in the law after *Booker* , we see no reason to depart from these precedents here.

Second, we consider this case in light of one of the underlying purposes of the plain error doctrine: the economy of judicial resources. In summary, an unnecessarily restrictive plain error analysis will result in substantial additional work for this court and will save the district courts almost no time. Moreover, a restrictive plain error rule would result in the unseemly result of defendants being sentenced under rules that were not valid and without any notice that the rules were not valid. Given the minimal time needed to allow the district court to sentence Barnett under the correct standard, I would remand this matter for re-sentencing.

The efficient administration of justice is one of the underlying purposes of the plain error doctrine. The plain-error analysis promotes the efficient administration of justice in two regards. First, the rule allows consideration of some errors despite no trial objection. By considering certain errors without objection, the rule avoids incessant trial objections, objections made solely to preserve an issue upon the possibility that there may be an intervening change in the law. As the Supreme Court has found, a rule that never considered errors unless there had been a trial objection "would result in counsel's inevitably making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Second, if every error resulted in reversal, trial courts would spend inordinate amounts of time re-trying cases that involved insubstantial errors.

Endeavoring to avoid both these inefficiencies, the plain-error rule limits errors that result in remand to those that involve substantial rights and a showing that a defendant has been prejudiced. As the Seventh Circuit has stated, "The plain-error standard, which applies when a district court has not been given the first opportunity to correct alleged mistakes, strikes a balance among the proper functioning of the adversary system, *efficiency in managing litigation*, and the demands of justice." *United States v. Wilson*, 237 F.3d 827, 836 (7th Cir. 2001) (emphasis added), *cert. denied*, 534 U.S. 840 (2001). In the posture that we now find ourselves after the Supreme Court's decision in *United States v. Booker*, 543 U.S. __, 125 S. Ct. 738 (2005), I believe it more efficient to *remand* this case to the district court for re-sentencing. Otherwise, we adopt a rule that results in an inordinate expenditure of appellate court resources, yet saves the district court little.

The fourth prong of the plain error analysis directs attention to whether unraised errors "seriously affect the fairness, integrity, or public reputation of judicial proceedings," and gives the court discretion in determining whether to remand a case to the trial court. Among the concerns that appellate courts take into account, not least is a concern for judicial economy.[2] Indeed, many courts decline to remand where a new trial would expend an unnecessary amount of judicial resources. *See, e.g., United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir. 1996) (under the circumstances, "to expend the judicial resources necessary for a retrial would be more detrimental to the fairness, integrity, and public reputation of judicial proceedings than permitting [Appellants'] convictions to

---

[2]We may consider judicial resources when applying the fourth prong of the plain error test. This analysis does not affect the third prong, which concerns whether the error "affects the substantial rights" of the defendant.

stand"); *United States v. Ross*, 77 F.3d 1525 (7th Cir. 1996) (finding the first three factors of the plain error test met but determining that "it would be an unnecessary waste of judicial resources to retry this case" based on the error at hand); *United States v. Izaguirre-Losoya*, 219 F.3d 437, 442 (5th Cir. 2000) (finding, under the circumstances, that to remand would be "an empty formality and waste of judicial resources").

Notably, in the cases cited above, appellate courts declined to remand, because to *retry* a case would be to expend a great amount of resources. By contrast, where a re-sentencing is at issue, the costs are far less. *See, e.g.,* Charles A. Wright, *Federal Practice and Procedure* § 856, at 511-12 (2004) ("Some have suggested that errors in sentencing, unraised below, should be reviewed with a less deferential standard as the costs of re-sentencing are lower than the costs of retrial."). In this vein, we note the Second Circuit case of *United States v. Sofsky*, 287 F.3d 122 (2d Cir. 2002). In *Sofsky*, the Second Circuit stated that, because remanding would not precipitate a new trial but, rather, a re-sentencing, "it appears that in the sentencing context there are circumstances that permit us to relax the otherwise rigorous standards of plain error review to correct sentencing errors." *Id.* at 125.

Having presided over hundreds, if not thousands, of sentencings, I believe the time devoted to post-*Booker* re-sentencing would be small. Since the 1940s, district court judges have submitted monthly reports that generally detail the time they expend on various court functions, the JS-10 report. These reports for the Northern District of Ohio indicate that the amount of time spent on sentencing before *Booker* averaged less than 45 minutes.[3] Sentencing on remand would be significantly less.

At resentencing, the sentencing court is already familiar with the pre-sentence report. Given earlier opportunities to present evidence on disputed guideline calculations, there would be no need to reopen the case for hearing on those issues. The re-sentencing hearing would simply allow the trial court to apply the proper standard, typically with only limited input from the defendant.

In contrast, the time spent by each court of appeals panel required to analyze the application of plain error, would be multiples greater. And the result of this expenditure of judicial resources would be that a defendant was sentenced using a standard that was clearly wrong.

I do not suggest that plain errors in sentencing should always be subject to less rigorous review. I do suggest that in the situation in which we here find ourselves, it is appropriate to consider judicial resources. Here, as the Court lays out in its opinion, the first three prongs of the plain error test are met. Further, the "fairness, integrity, and reputation of judicial proceedings" are very much at stake – defendants with active cases on appeal were sentenced under the wrong rules.

Guessing at what a district judge would have done had she known the greater discretion afforded by *Booker* affects the public reputation of judicial proceedings. Rather than attempt to predict what a district court would have done, we should follow the more efficient path -- we should remand this matter to the district court. As *Williams* v. *United States* reiterated: "it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence." 503 U.S. 193, 205 (1992) (citations omitted).

---

[3]The JS-10 report may overstate the time used for sentencing. The minimum time increment is one-half hour. Even using this minimum time increment, in the three month period between November 2004 to January 2005, Northern District of Ohio judges sentenced 222 defendants and averaged less than 45 minutes per sentencing hearing.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

BOGGS, Chief Judge, concurring in part and dissenting in part. Although I concur in all other parts of the court's opinion, I do not believe that Barnett has shown that any error in sentencing was prejudicial. I therefore respectfully dissent in part.

I agree with the court's conclusion that the district court's use of the pre-*Booker* sentencing rubric was plainly erroneous in light of present law, but I do not believe Barnett has shown the error prejudiced his sentencing. First, as a factual matter, I believe the record indicates the district court felt the sentence was fair and would therefore give the same sentence post-*Booker*. Second, as a matter of law, I believe the court errs by concluding that we should reverse when the record is silent as to prejudice.

**I**

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court found the Sentencing Guidelines unconstitutional because they permitted judicial fact-finding to increase a sentence beyond that authorized by the jury conviction, in violation of the Sixth Amendment. *Booker* produced two majority opinions, both by a 5-4 vote, with only Justice Ginsberg joining both opinions. The first, by Justice Stevens, found the Guidelines unconstitutional. *Id.* at 745-56. The second, by Justice Breyer, provides the remedy. *Id.* at 756-70. The Court's solution was to strike 18 U.S.C. § 3553(b)(1), which is the provision making the Guidelines mandatory. *Id.* at 756-57. The Court left intact the remainder of the Guidelines in an advisory role, instructing that they must be consulted by a sentencing court but are no longer binding. *Ibid.* The Supreme Court has instructed us to apply *Booker* to cases on direct review using "ordinary prudential doctrines" and applying the "plain-error test." *United States v. Booker*, 125 S. Ct. 738, 769 (2005). The Court also stated that not "every appeal will lead to a new sentencing hearing." *Ibid*.

Plain error is a highly deferential standard of review: "[t]he Supreme Court and numerous federal courts have repeatedly stated that the plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 483 (6th Cir. 1999) (quotations omitted). Before we can consider reversing for plain error, the defendant must show that error was prejudicial: that it affected his "substantial rights," or, in other words, that it "affected the outcome of the district court proceedings." *United States v. Cotton*, 535 U.S. 625, 632 (2002). The defendant bears the burden of showing that the error was prejudicial and altered the outcome. *United States v. Olano*, 507 U.S. 725, 734 (1993).

There is ample evidence in the record that the district court believed Barnett's sentence of 265 months in prison to be proper in light of traditional sentencing considerations. Based on offense level and history, the Guidelines dictated a sentencing range of 235 to 292 months, and the district court imposed a sentence of 265 months. Thus, the district court eschewed the use of discretion that it clearly possessed, pre-*Booker*, to reduce the sentence by as much as 30 months. In this case, all that *Booker* added was some, though not unfettered, discretion to reduce the sentence yet further, though with significant restraints. *Booker*, 125 S. Ct. at 764-65 (stating that the Sentencing Guidelines still impose a number of requirements on judges, such as the requirement to consider the Guideline sentencing range, the need to avoid sentencing disparities, reasonableness of the sentence, and other statutory factors). Within the Guideline range, district judges have always exercised their discretion in light of traditional factors, such as the nature of the offense, the character of the defendant, the deterrent effect, and the future dangerousness of the defendant. *See* 18 U.S.C.

§ 3553(c) (when the Guideline range exceeds 24 months, the district court must state in open court the reason for choosing a point in that range); *United States v. Zackson*, 6 F.3d 911, 923-24 (2nd Cir. 1993) (remanding for resentencing when the district court failed to articulate any reason at all for why a particular sentence was selected). When the district court selected a sentence in the middle of the permissible range, it presumably did so because it felt that this would be the just sentence in light of the articulated traditional factors. Had it believed that Barnett warranted a more lenient sentence for any reason, the court was free to reduce his term of imprisonment. The fact that it did not is a strong indication that the district court did not think a lighter sentence was warranted.[1]  On this record, I conclude that the mandatory nature of the Guidelines at the time Barnett was sentenced did not affect the sentencing outcome, and certainly that he has not demonstrated such an effect.

Even assuming, *arguendo*, that the record is silent as to prejudice, we should still affirm. The court states that it "refuse[s] to speculate as to the district court's intentions in the pre-*Booker* world." Op. at 10. This abrogates the long-held rule that plain error review *requires* us to determine whether the outcome would be different had the law been correctly applied. This is the heart of the "affects substantial rights" inquiry. *United States v. Jones*, 527 U.S. 373, 394-95 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights."); *Cotton*, 535 U.S. at 632 (for plain error to have affected substantial rights, it "must have affected the outcome of the district court proceedings") (quotations omitted). What the court dismisses as speculation is precisely the exercise that we must undertake in plain error review. The court does not identify even a sliver of evidence suggesting Barnett would have received a different sentence had the district court applied the post-*Booker* law. Indeed, it cannot do so, because no such evidence exists. Instead, the court grasps onto only the "distinct possibility that the district court would have imposed a lower sentence under the new post-*Booker* framework." Op. at 10-11. A different sentence cannot be conclusively ruled out, but to reverse we must find more than the mere metaphysical possibility that the outcome might have been different. There must be some affirmative evidence to suggest that the error likely altered the outcome before we can consider reversing. Because there is no such evidence, Barnett cannot show that his substantial rights were affected.

## II

Perhaps recognizing that the evidence in this case does not support a finding of prejudice, the court argues that prejudice should be presumed. The court believes that we should presume prejudice when the "inherent nature of the error made it exceptionally difficult for the defendant to demonstrate that the outcome of the lower court proceeding could have been different had the error not occurred." Op. at 9. This inverts the burden in plain error review. It is well settled that the *defendant* must show prejudice before a reviewing court may reverse. *Olano*, 507 U.S. at 734. I do not believe this inversion is warranted. Moreover, even if there were such a presumption, it is rebutted by affirmative evidence that the district court believed its sentence to be appropriate in light of traditional factors.

Contrary to the court's suggestion, the Supreme Court has never put its imprimatur on the idea that we may presume prejudice in plain error review. The passage upon which the court relies

---

[1] In contrast, when a district court sentences at the bottom of a Guideline range, this would support an inference of possible prejudice. If the district court believed, in light of traditional factors, that a defendant should receive a sentence lower than the Guideline range, it would necessarily, in the pre-*Booker* world, impose a sentence at the bottom of the range. Thus when there is a sentence at the bottom of the Guideline range there are two possibilities: 1) that the district court thought that the minimum Guideline sentence was appropriate, or 2) that the district court preferred some sentence below the minimum Guideline sentence. Since the set of possible sentences in the second option is always the larger of the two, a sentence at the Guideline minimum suggests the district court might have been more lenient had it felt free to do so.

is a single sentence in a Supreme Court opinion refusing to consider the issue. *Olano*, 507 U.S. at 735 ("Nor need we address those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice."). Indeed, if the Supreme Court believes that we should presume prejudice when it would be difficult for the defendant to establish it, it is hard to explain why the Court has passed up so many opportunities to articulate such a doctrine.

The Supreme Court has repeatedly applied standard plain error review even in circumstances where it would be "exceptionally difficult" for the defendant to show prejudice. In the capital case of *Jones*, 527 U.S. at 373, the Court considered possible prejudice from jury instructions that the defendant alleged may have misled the jury into believing the judge would impose a lesser sentence if the jury could not unanimously decide on either a life sentence or the death penalty. It would obviously be exceptionally difficult to show that this alleged error affected the sentence, since jury deliberations are secret. The Court nonetheless applied standard plain error review for prejudice:

> Moreover, even assuming that the jurors were confused over the consequences of deadlock, petitioner cannot show the confusion necessarily worked to his detriment. It is just as likely that the jurors, loath to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence. *Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights.* In *Romano*, we considered a similar argument, namely, that jurors had disregarded a trial judge's instructions and given undue weight to certain evidence. In rejecting that argument, we noted that, even assuming that the jury disregarded the trial judge's instructions, "[i]t seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so." Any speculation on the effect of a lesser sentence recommendation, like the evidence in *Romano*, would have had such an indeterminate effect on the outcome of the proceeding that we cannot conclude that any alleged error in the District Court's instructions affected petitioner's substantial rights.

*Id.* at 394-95. The Eleventh Circuit has determined that *Jones* is controlling in plain error review of pre-*Booker* sentences. *United States v. Rodriguez*, No. 04-12676 at *23 (11th Cir. Feb. 4, 2005) ("where the effect of an error . . . is uncertain or indeterminate – where we would have to speculate – the appellant has not met his burden of showing a reasonable probability the result would be different but for the error; he has not met his burden of showing prejudice"). I agree.

The fact that there is no evidence supporting Barnett's claim of prejudice does not mean it is categorically "extraordinarily difficult" for defendant's to establish prejudice in pre-*Booker* sentencing. In fact, we often have had evidence on the record when district courts are dissatisfied with the sentence the Guidelines required them to give. Sentencing courts are required by law to give reasons in open court for the sentence they select whenever the range is greater than 24 months. 18 U.S.C. § 3553(c). And even when this rule does not apply, district courts typically explain their chosen sentence. We may also infer possible prejudice when a district court sentences at the bottom of the range. *See supra* n.1. It is no more difficult to establish prejudice here than in the vast run of cases involving plain error review.

Nor did *Booker* expand the factors a district court could consider when selecting a sentence. The court suggests that now counsel could present aggravating and mitigating circumstances that were "not available for consideration under the mandatory Guidelines regime," Op. at 10 (quotations removed), but the court does not indicate what those additional circumstances might be. This argument ignores a fundamental feature of the Guidelines: they present a sentencing court with a *range*, from which it must select a sentence. In this case the range was nearly five years – 57 months. Counsel already had every reason and every opportunity to present any mitigating

circumstance that might possibly have saved Barnett from an additional five years in prison. Any arguments that might be raised post-*Booker* about culpability, future dangerousness, offsetting good works, family obligations, or any other mitigating circumstance were also fair game pre-*Booker*, and these arguments for mitigation have been regularly invoked by defense counsels in pre-*Booker* sentencing proceedings. *United States v. Riascos-Suarez*, 73 F.3d 616, 627-28 (6th Cir. 1996) (finding reversible error when the defendant was not offered the opportunity to give mitigating evidence at sentencing). The Guidelines never placed any limits on the ability of the district court to consider these factors, so there is no reason to remand so the district court may consider additional circumstances.[2]

Most importantly, the presumption is irrelevant because here we have concrete evidence in the record that the district court had no desire to give Barnett a lower sentence. The district court, in light of traditional factors, could have given Barnett 30 months less in prison if it had believed such a sentence warranted. We need not speculate as to what the district court would have done if it had the discretion to give a more lenient sentence, because it already had such discretion. Assuming, *arguendo*, a presumption of prejudice, it is rebutted by the record.

### III

Finally, it is significant that this case does not involve a Sixth Amendment violation. Unlike *Booker* itself, and *United States v. Hughes,* No. 03-4172, 2005 WL 147059, at *5 n.6 (4th Cir. Jan. 24, 2005) (stating that it is remanding based only on error due to a Sixth Amendment violation and noting that "[t]his case does not present the question of whether a defendant suffers prejudice because a sentencing court fails to treat the guidelines as advisory in determining the sentence"), upon which the court relies, sentencing in this case was not based on judicial fact-finding. The only factors that determined Barnett's Guideline range were the jury conviction itself and prior felony convictions. Thus, unlike *Booker*, the determination of the range was not a constitutional violation. As the court correctly stated, it is well settled that the Sixth Amendment does not require that prior convictions be found by a jury. Op. at 7 (citing *United States v. Campbell*, 270 F.3d 702, 707-09 (8th Cir. 2001); *accord Booker*, 125 S. Ct. at 756 ("Any fact (*other than a prior conviction*) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.") (emphasis added). This is highly significant, because only when a sentence is based on judicial fact-finding – as in *Booker* and *Hughes* – may the sentence be said to have resulted from Sixth Amendment error.

### IV

The efficiency argument made in the concurrence by Judge Gwin, while intriguing, suffers from two defects. First, lowering the threshold for showing prejudice based on "efficiency considerations" is novel and has no basis in the Supreme Court's instructions with respect to remedy. *Booker*, 125 S. Ct. at 769 (cases on direct review should be reviewed using "ordinary prudential doctrines" and applying the "plain-error test," and "not every appeal will lead to a new sentencing hearing"). Judge Gwin seems to be arguing that judicial economy warrants a blanket remand of all pre-*Booker* sentences on direct review. If the Court's directions are to be followed, we cannot simply conclude that the prejudice inquiry is waived in the interests of judicial economy.

---

[2]This distinguishes the allocution cases upon which the court relies. Op. at 8-9. The court noted that some circuit courts have held that prejudice can be presumed in plain error review when the defendant was not offered the opportunity to present mitigating circumstances. In such cases, it is indeed true that the district court was never presented with potential mitigating circumstances that may have affected the sentence. Here, however, counsel had every reason to present every possible mitigating circumstance and *Booker*, while it has expanded sentencing discretion, has not expanded the range of possible considerations when determining a sentence.

Second, a remand in this particular case would not be resource efficient. While the district court is likely to be somewhat familiar with the case already, after more than a year it will be necessary to review the case before resentencing. We must also consider the need for the parties to submit arguments and to participate in the resentencing, however streamlined. Finally, after sentencing there will be the inevitable appeal to this court. Both district and circuit courts must expend non-trivial effort to resolve even the easy cases, where the outcome is never in doubt. And we must not forget the energy the parties must expend to make their arguments before us.

While I would not necessarily dismiss efficiency considerations altogether, I conclude that in this case judicial economy is best served by affirming. However streamlined, a remand proceeding clearly expends some judicial resources (and the resources of the parties). If we are sufficiently certain that the district court would not alter its sentence, than no efficiency purpose is served by remand. Here, I think we can be quite certain the district court would not alter its sentence. Armed with all the facts and having heard the parties fully, the district court chose not to reduce the sentence by up to 30 months. I see not one iota of evidence suggesting that the court would be persuaded to reduce the sentence simply because it had more discretion, when it left unused the discretion it already possessed. These facts can be ascertained quickly and easily by a reviewing court. There may be other cases where judicial economy tips the scales in favor of remand rather than further analysis – such as when the defendant is sentenced at the bottom of the Guideline range – but this is not such a case.

I also note that the efficiency point is in tension with the court's argument that remand will allow the district court to consider additional mitigating circumstances. Op. at 9-10. If the resentencing is to be highly efficient, permitting only "limited input from the defendant" and relying upon evidence already presented, then there is little or nothing new for the district court to consider. But if there are any additional mitigating circumstances, than the resentencing will be more cumbersome than the lean procedure envisioned in support of Judge Gwin's efficiency argument. It is difficult to see how resentencing by the district court can be both highly streamlined and give full consideration to additional mitigating circumstances.