*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

Nos. 04-5189/5190

GEORGE MOONEYHAM,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 00-00065; 02-00073—J. Ronnie Greer, District Judge.

Argued: June 5, 2006

Decided and Filed: January 9, 2007

Before: SILER, DAUGHTREY, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Linda S. Sheffield, Atlanta, Georgia, for Appellant. Guy W. Blackwell, ASSISTANT UNITED STATES ATTORNEY, Johnson City, Tennessee, for Appellee. **ON BRIEF:** Linda S. Sheffield, Atlanta, Georgia, for Appellant. Dan R. Smith, ASSISTANT UNITED STATES ATTORNEY, Johnson City, Tennessee, for Appellee.

_____

## OPINION

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge. This appeal is from district court judgments entered against defendant George Mooneyham that arose from charges in two separate indictments and resulted in separate convictions following two separate jury trials. The cases were consolidated in the district court at sentencing, but for purposes of our analysis, they will be treated as separate cases in this opinion. In each case, we find no reversible error in connection with Mooneyham's convictions, but both cases must be remanded for resentencing under *United States v. Booker*, 543 U.S. 220 (2005), which was decided by the United States Supreme Court while these cases were on appeal.

## I.  APPEAL NUMBER 04-5189

In the earlier of the two cases, Mooneyham was convicted on two counts of conspiracy to distribute 500 or more grams of cocaine.  He claims (1) that his right to confrontation was violated by the introduction at trial of statements made by his co-defendant, Sheridan McMahan; (2) that the district court erred by permitting character evidence in violation of Federal Rule of Evidence 404(a); and (3) that evidence seized from his vehicle should have been suppressed.

### A.  *Factual and Procedural Background*

Prosecution of Mooneyham stemmed from an undercover investigation undertaken jointly by the Tennessee Bureau of Investigation and law enforcement agencies in North Carolina that focused initially on McMahan.  In March 2000, TBI Agent Jim Williams, acting undercover, purchased large quantities of marijuana from McMahan, who indicated that he could also broker a deal for large quantities of cocaine, provided that Williams fronted him the money.  Agent Williams put McMahan in contact with Terry Johnson, a law enforcement agent in North Carolina, who posed as a prospective buyer using his own name.  Johnson arranged for McMahan to travel from Tennessee, meet with him at Harrah's Cherokee Casino in North Carolina, pick up the money for the cocaine and take it to McMahan's supplier in Tennessee to make the purchase, and then return to North Carolina and give the cocaine to Johnson.

Surveillance of the transaction, coordinated by Agent Williams, established that after meeting with Johnson, McMahan drove north in a maroon Honda Civic on Interstate 40 to Exit 447, near his residence in the Grassy Fork community of Tennessee.  McMahan switched vehicles at his residence and drove a light-colored Taurus to Mooneyham's residence at 1940 Hartford Road.  McMahan stayed inside the residence for 30-45 minutes and then drove straight back to North Carolina, where he delivered two ounces of cocaine to Johnson.  This entire transaction was observed by TBI Agent Robert Burnette by means of aerial surveillance.

A similar transaction, in which McMahan was to supply Agent Johnson with four ounces of cocaine, was scheduled for the following week.  Agent Williams played the role of Agent Johnson's subordinate, responsible for carrying the money to Tennessee.  Williams drove with McMahan to Tennessee and waited at a truck stop near Exit 447 while McMahan went to meet his supplier, defendant Mooneyham.  Ground surveillance of this transaction was conducted by TBI agents James Whitson and Greg Monroe, who had positioned themselves in the woods behind Mooneyham's property. They observed someone driving a maroon Honda Civic turn into the driveway, pull around behind the residence, and honk.  Mooneyham came out carrying a white package, walked to the passenger side of the vehicle, and then returned to the residence. The car pulled out of the driveway a few minutes later.  McMahan returned to the truck stop, picked up Agent Williams, and together they drove back to North Carolina, where they delivered the cocaine to Johnson.  Agent Burnette also observed this transaction by aerial surveillance.

Williams later testified that during the one-hour drive back to North Carolina, he and McMahan talked freely, primarily about the drug business.  McMahan told Williams that his supplier was a very careful man, that he had been in the penitentiary before, that he was a car thief, that he drove a green 1997 or 1998 Ford F-150, and that he lived about 50 yards from the interstate highway.

Johnson arranged yet another transaction, involving 20 ounces of cocaine, to take place six days later and to be carried out by the same scheme.  In addition, Agent Williams obtained a search warrant for Mooneyham's residence, intending to execute it immediately after McMahan left Mooneyham's residence with the cocaine.  The plan was to arrest Mooneyham at that time and then arrest McMahan in North Carolina.  On this occasion, however, events did not go as planned.

On the day of the transaction, McMahan, Johnson, and Williams met at the casino in North Carolina, where McMahan explained that the deal would be done in two segments, ten ounces at a time. Williams rode with McMahan to Tennessee, where they went to McMahan's residence to change vehicles. McMahan went inside his house and then reported to Williams that his supplier was running errands and that it would be a while before he became available. After waiting for an hour, McMahan received a telephone call and reported that the deal would be transacted at the truck stop and that Williams would have to wait at a different location. Williams was dropped off at a white-water rafting business and left to wait.

In the meantime, Agents Whitson and Monroe were in surveillance positions behind Mooneyham's house, where they observed Mooneyham leave his house driving a green Ford pickup. He returned about an hour later. Soon thereafter, he walked to a camper-trailer on the property, came back out carrying something red, and then walked toward a barn on the property. Next, he walked into the woods, where he remained for about five minutes before returning to his residence. After approximately five minutes, he drove away from his property in an orange dump truck, heading in the direction of the interstate. In a truck stop near Exit 447 of the interstate, Agent David Morris, who was assisting with ground surveillance, observed the driver of the orange dump truck meet with the driver of another vehicle in the parking lot.

About an hour after leaving Williams at the rafting company, McMahan returned to pick him up. When Williams asked McMahan "how it went," he responded, "It didn't," and indicated that he was not able to find his supplier. Williams later testified that McMahan's demeanor had changed and that on the ride home, they spoke about the weather and fishing rather than the drug business. When they met Agent Johnson in North Carolina, McMahan was arrested.

Meanwhile, when Mooneyham returned to his property, the agents waiting there executed the search warrant and took Mooneyham into custody. As Mooneyham was being escorted from his truck, Agent Morris looked into the front seat and observed a document that turned out to be a warrant for the arrest of one Walter Seay, issued in North Carolina at the behest of complaining officer Terry Johnson, the same agent with whom McMahan had been dealing undercover but without the protection of an alias.

When the search of Mooneyham's property failed to reveal any cocaine or money, Agent Whitson remembered that Mooneyham had walked into the woods earlier in the day. Whitson searched the woods, "looking for anything out of the ordinary," and found a blue Wal-Mart bag buried in a stump. In the bag was a "crock pot" containing cocaine. Later lab reports established that a latent fingerprint lifted from it matched that of Mooneyham's left middle finger.

Mooneyham and McMahan were charged in a 10-count indictment with drug-trafficking. After his first trial ended in a mistrial, Mooneyham was released on bond awaiting retrial but absconded. He was captured and rearrested a year later. At the second trial, he objected – unsuccessfully – to the admission of evidence seized from his residence, his truck, and the woods surrounding his property. The district court also admitted over objection several tape-recorded statements made by McMahan in conversation with Agent Williams. Mooneyham was convicted by a jury on all counts of the indictment.

## B. *Discussion*

### 1. **Admissibility of Extrajudicial Statements**

Mooneyham alleges that because McMahan did not testify at trial, Agent Williams's testimony regarding statements that McMahan made during one of their car trips between North Carolina and Tennessee were admitted in violation of his Sixth Amendment right of confrontation. Specifically, the defendant objected to the statement attributed to McMahan by Williams to the

effect that "his supplier [Mooneyham] was a very careful man; that he had been in the penitentiary before; that he was a car thief; that he was a neat freak; that he drove a green '97 or '98 Ford F-150; and . . . [he] didn't live but about 50 yards from the interstate."

The defendant contended at trial that introduction of such statements would violate the rule in *Bruton v. United States*, 391 U.S. 123 (1968), which prohibits the introduction of statements made by a non-testifying co-defendant that implicate the defendant because they would deprive the defendant of the right to confrontation. The defendant's motion to exclude was granted, but only to the extent that the statements at issue did not qualify as co-conspirator statements made in furtherance of the conspiracy. Those, the district court ruled, were admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence, subject to the requirement, set out in *United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979), that the government must establish the existence of the conspiracy by a preponderance of the evidence. As a result, the specific statement set out above was admitted into evidence.

We find no error in the district court's ruling under Rule 801(d)(2)(E), which provides that a statement offered against a party that is made by a co-conspirator during the course of and in furtherance of that conspiracy is admissible as a non-hearsay statement. McMahan was indisputably Mooneyham's co-conspirator, and the statement in question was clearly made in furtherance of the conspiracy because it was directed at a potentially recurring customer (Agent Williams) with the intention of reassuring him of Mooneyham's reliability as a supplier. *See*, *e.g.*, *United States v. Salgado*, 250 F.3d 438, 449-50 (6th Cir. 2001); *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994). *See also United States v. Swidan*, 888 F.2d 1076, 1081 (6th Cir. 1989) (co-conspirator statements made to an undercover officer held admissible under Rule 801(d)(2)(E)).

There remains the question of admissibility under *Crawford v. Washington*, 541 U.S. 36 (2004), an issue of constitutional dimensions. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford*, the Supreme Court announced a new standard for assessing whether hearsay statements, otherwise admissible under principles of evidence, violate the mandate of the Confrontation Clause. Under this rule, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is . . . confrontation." 541 U.S. at 68-69. In order to introduce testimonial hearsay in a criminal prosecution, the government must demonstrate that the declarant is unavailable to serve as a witness, and that the defendant had a prior opportunity to cross-examine the declarant. *See* 541 U.S. at 54-55.

The threshold question, then, is whether McMahan's statement was "testimonial." In this regard, the proper inquiry is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). McMahan's statements were admitted into evidence under the theory that they were statements made by a co-conspirator in furtherance of the conspiracy. By definition, such statements are not by their nature testimonial; the one making them has no "awareness or expectation that his or her statements may later be used at a trial." *Id.* at 674 (internal quotation omitted). Indeed, the *Crawford* court specifically identified statements in furtherance of a conspiracy as examples of statements that are inherently non-testimonial. *See* 541 U.S. at 51, 56 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Because McMahan was not aware that Williams was a police officer, his remarks were not the product of interrogation and were not testimonial in nature. Hence, there was no *Crawford* error in the introduction of those remarks.

After *Crawford*, non-testimonial statements continue to be analyzed with respect to the Confrontation Clause under the rule of *Ohio v. Roberts*, 448 U.S. 56 (1980). *See* 541 U.S. at 68; *United States v. Gibson*, 409 F.3d 325, 337-38 (6th Cir. 2005) (noting that *Crawford* did not disturb the rule that non-testimonial statements are constitutionally admissible if they satisfy the *Roberts* standard). Under this rule, statements may be admitted in absence of cross-examination only when they bear adequate indicia of reliability or when they fall within a "firmly rooted" exception to the hearsay rule. *See Roberts*, 448 U.S. at 66; *Crawford*, 541 U.S. at 42. Co-conspirator statements in furtherance of a conspiracy are both inherently trustworthy and "firmly rooted." "[T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987).

For these reasons, we conclude that the district court did not err in admitting McMahan's statement under Rule 801(d)(2)(E) and that the defendant has failed to establish that Agent Williams's testimony concerning the statement violated his right to confrontation.

## 2. Admissibility of Character Evidence

Mooneyham next argues that the district court committed reversible error by admitting statements that put his character in a negative light before the jury, in violation of Rule 404(a) of the Federal Rules of Evidence, which bars the admission of character evidence to prove guilt. Mooneyham points specifically to two facets of Agent Williams's testimony, first, McMahan's statement that his supplier had been "in the penitentiary before" and, second, Williams's comment at the beginning of his testimony that he had "known George Mooneyham pretty much since I've been a TBI agent." Williams also mentioned the fact that "[Mooneyham] was the subject of some drug investigations by the TBI" and Agent Morris testified in passing that he knew Mooneyham because "[h]e was the subject of some drug investigations by the TBI."

Mooneyham did not object contemporaneously to any of these statements, but he did file a pleading labeled "continuing objection to any testimony about co-defendant McMahan's source having been in the penitentiary" that was heard by the magistrate judge who handled pretrial proceedings and granted. The district court later inquired from the government whether it intended to introduce such evidence in the retrial of the case. The prosecution responded by indicating its intention to admit testimony that McMahan had stated to undercover agent Williams that his supplier had been in the penitentiary and had pulled an extra two years rather than "rat" anybody out. The district court ruled that the statement could be admitted and that Mooneyham need not make a contemporaneous objection.

Significantly, however, the statements made by Agents Williams and Morris regarding their prior knowledge of Mooneyham do not fall within the ambit of this continuing objection. They must therefore be reviewed under the plain error standard, requiring a showing by the defendant (1) that their introduction was error, (2) that the error was "plain," and (3) that it affected his substantial rights. If all three conditions are met, we will note the error *if* (4) it seriously affected "the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 465-67 (1997). The phrase "affects substantial rights" "means prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993).

We conclude that the district court did not commit an abuse of discretion in allowing Williams to testify as to McMahan's statement that his unnamed supplier had served time in the penitentiary. As noted above, that statement was admissible because it "was made in furtherance of the conspiracy to assure Williams that the 'source' could be trusted."

The other references to Mooneyham's prior incarceration raise a different question.  The defendant describes the testimony of Agents Williams and Morris regarding their prior knowledge of Mooneyham as "gratuitous, with no other purpose other than to make Mooneyham look guilty." Williams testified as follows:

> Q:    Mr. Williams, do you know the defendant in this case?
>
> A:    Yes, sir, I do.
>
> Q:    And when did you first become aware of the defendant in this case?
>
> A:    I've known . . . of George Mooneyham pretty much since I've been a TBI agent.
>
> A:    And that's been for ten and a half years, is that correct?
>
> Q:    Yes, sir.

Morris's statements are perhaps less gratuitous and, as argued by the government, could reasonably be interpreted to mean that Morris's knowledge of Mooneyham was limited to the particular TBI investigation at issue in the case:

> Q:    So in April of 2000, you were still operating as a special agent in charge of the TBI drug unit here in East Tennessee?
>
> A:    Yes, sir.
>
> Q:    And for how long, sir, did you serve in that capacity?
>
> A:    Two years.
>
> Q:    Sir, are you familiar with the defendant in this case?
>
> A:    Yes, sir.
>
> Q:    And how is it that you know the defendant, sir?
>
> A:    He was a subject of some drug investigations by the TBI.
>
> Q:    Were you involved in that investigation at all?
>
> A:    I was involved somewhat, not as much as the other agents. I assisted some on surveillance and assisted them. I was aware of it because I was their supervisor.

Mooneyham argues that the prejudicial effect of these statements constitutes plain error because the evidence against him was not overwhelming.  The government, on the other hand, argues that if the introduction of these brief references were admitted in error, they did not affect his substantial rights, in light of the overwhelming evidence of his guilt.  We agree and conclude that any error in the admission of the challenged testimony did not constitute reversible error.

### 3. Admissibility of Seized Evidence

The defendant's final challenge is to the admissibility of the search warrant for a third party, Walter Seay, that was spotted on the front seat of his dump truck, from which Mooneyham exited immediately before his arrest. That warrant was significant in that it bore the name of Agent Terry Johnson. Because Johnson was not using an alias, Mooneyham's possession of the Seay arrest warrant indicated his awareness that Johnson, posing as the buyer of cocaine that Mooneyham was supplying, was in fact an undercover agent. It was introduced at trial to explain why the final transaction that McMahan had arranged was abruptly cancelled, and it came in over the defendant's objection that it should have been suppressed as the fruit of an illegal search.

This contention is based on the defendant's extended analysis of various flaws that he claims undermine the validity of the search warrant for his residence. But the district court did not determine that the Seay arrest warrant was admissible based on the search warrant. Instead, the court upheld the search of Mooneyham's truck and the seizure of the Seay warrant as incident to the defendant's arrest. The defendant now challenges this ruling on the ground that the document was removed from the front seat of his truck prior to his being placed under arrest, which was accomplished only after the crock pot containing the cocaine was retrieved from the woods. We simply find no merit to this argument.

Although the agents who were involved in the defendant's arrest did not have an arrest warrant for Mooneyham when they arrived at his residence, they clearly did have a reasonable suspicion that criminal activity was afoot on the basis of the prior transactions that had been traced to Mooneyham and of information about the transaction that was set to occur that day. Hence, it was objectively reasonable to stop Mooneyham immediately on his arrival. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (standard for a valid stop depends on whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate" (citation omitted)). Moreover, the agent who searched the defendant's truck at the time of the stop had a reasonable concern for officer safety, which is a sufficient basis on which to inspect the interior of the truck. *See United States v. Ridge*, 329 F.3d 535, 540-41 (6th Cir. 2003) (permitting *Terry* stop and search of defendants and their vehicle as they arrived at residence where officers were executing search warrant for methamphetamine lab, based on officers' information supporting reasonable belief defendant was involved in drug trafficking). It follows that the district court did not err in ruling that the Seay warrant was admissible in evidence.

### C. *Conclusion*

For the reasons set out above, we affirm the judgment of conviction entered by the district court in this case.

## II.  APPEAL NUMBER 04-5190

Mooneyham and McMahan were tried jointly on a multi-count indictment. Mooneyham was acquitted on two counts; a mistrial was declared as to the other two counts against Mooneyham and all counts against McMahan. During the period before retrial, the TBI developed another case against Mooneyham, unrelated to the first one. He was eventually tried in both cases a week apart. In addition to the convictions discussed above in No. 04-5189, Mooneyham was convicted in the second case on three counts of distribution of cocaine and methamphetamine. On appeal in this second case, he contends (1) that his Sixth Amendment right to counsel of choice was violated when the district court denied his motion for a continuance and substitution of counsel; (2) that the court erred in permitting a witness to testify despite the fact that defense counsel was not provided with a copy of the witness's sealed plea agreement in an unrelated case; and (3) that the district court

should have declared a mistrial after the jury was allowed to hear a tape-recording that contained a single statement that had previously been ruled inadmissible as hearsay. We find no reversible error and affirm the convictions.

## A. *Factual and Procedural Background*

The record in this case establishes that the charges arose from information that connected Mooneyham to drug deals involving one Scott Walker, who had been convicted and sentenced on federal drug charges in Knoxville. After Walker gave information to DEA agents, they contacted TBI Agent Jim Williams, who had been involved in the investigation of the defendant's prior drug-trafficking. Agent Williams met with Walker, who had known Mooneyham for some 18 years. He was instructed to call the defendant and offer to install an air conditioner that Mooneyham needed. Walker followed instructions and, as directed, asked at the end of the conversation whether Mooneyham could "get anything for me for my girlfriend," to which Mooneyham replied, "Maybe." This conversation was tape recorded and played for the jury at trial.

In advance of the arranged meeting with Mooneyham, Walker was searched, fitted with a recording device, and given $300 in marked money. Walker then drove to the car wash where he was to meet Mooneyham, followed by Agent Williams and two other agents in a separate vehicle. Walker was instructed to signal that the drug deal had taken place by thanking Mooneyham.

During the meeting, Agent Williams observed Walker and Mooneyham talking together. After about fifteen minutes, Agent Williams heard Walker say to Mooneyham, "Well, I appreciate it." Walker then left Mooneyham and proceeded directly to an arranged meeting place, where he gave Agent Williams a small bag of cocaine. Walker subsequently submitted to a search of his person and vehicle. He returned the $300 he had been provided, explaining that Mooneyham would not accept money.

A second transaction was set up, during which Walker was to install the air conditioner for Mooneyham and also purchase an ounce of cocaine. Walker was given $1400 in prerecorded buy money and fitted with a wire. In a conversation transmitted to Agent Williams, Mooneyham told Walker that his regular supplier was out of town, but he could likely get cocaine from a "guy in North Carolina." Later that day, the two met at a convenience market and, in a transaction that was recorded, Mooneyham provided Walker with a small bag of cocaine and with methamphetamine wrapped in a dollar bill. Again, Mooneyham did not accept Walker's money in exchange for the drugs.

Additional conversations between Mooneyham and Walker were recorded, the last on the day that Walker installed another air conditioner for Mooneyham, in which they discussed further purchases of cocaine. Mooneyham advised Walker that the quality was not good at that time and that there was not much quantity available.

Based on this evidence, Agent Williams obtained a federal criminal complaint and an arrest warrant against Mooneyham, charging Mooneyham with one count of distribution of a quantity of cocaine and a second count of distribution of a quantity of cocaine and methamphetamine, all in violation of 21 U.S.C. § 841(a)(1). At the subsequent trial, Agent Williams testified on behalf of the government, as did Walker. The jury heard several tape recorded conversations between Mooneyham and Walker. Mooneyham's counsel argued that Walker had opportunities to get the cocaine from sources other than the defendant before providing them to Agent Williams; that he always returned the money provided to him; that the recorded conversations were actually about innocent matters such as air conditioning units; and that Walker's testimony was motivated by a desire to reduce his own sentence. The jury, however, credited the government's evidence and convicted Mooneyham on both charges.

**B.** *Discussion*

**1. Denial of Motions for Continuance and for Substitution of Counsel**

Mooneyham contends that he is entitled to a new trial because he was denied counsel of his choice. At the conclusion of Mooneyham's first trial, four days before the trial in this case began, his appointed counsel, William Louis Ricker, filed a motion to withdraw in both cases and a motion for continuance in this case, indicating that he was doing so at his client's urging. The district court held a hearing and denied both motions.

The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defence." An essential element of this right is the right to have counsel of one's choice. *See United States v. Gonzalez-Lopez*, 126 S.Ct. 2557, 2561 (2006). However, the right to counsel of choice is not absolute. *Id.* "An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). We will reverse a district court's decision regarding an indigent defendant's motion for substitute counsel only if the district court has abused its discretion. *See id.* at 1130 n.8. Moreover, "[i]n order to decide whether a district court has abused its discretion, we must consider the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Saldivar-Trujillo*, 380 F.3d 274, 277 (6th Cir. 2004) (quoting *Iles*, 906 F.2d at 1130). In addition, "consideration of such motions requires a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice. *Id.*

There was no abuse of discretion in this case. At the hearing on the motion to continue, which was held just one day before the trial was scheduled to start, the district court heard testimony from all interested parties, including defense attorney Ricker, who informed the court that, following Mooneyham's conviction in the first case, he had indicated to Ricker that he "was not agreeable to going to trial" in this case as scheduled. Ricker said that he had advised Mooneyham that he did not feel a further continuance was necessary, and he summarized for the court his level of preparedness in both this case and the previous case.

Mooneyham told the district court that Ricker had advised against interviewing a possible defense witness in the previous trial and that Mooneyham believed that his resistance to the idea was a result of a conflict of interest (Ricker had represented this individual in an unrelated matter). Mooneyham also contended that he needed a continuance in order to have time to review personally the eleven cassette tapes and some videotapes provided by the government relating to the drug sales with which he was charged. He said that his "biggest complaint" was that he had not been able to understand what the evidence was against him in order to assist in his defense.

Attorney Edward L. Kershaw informed the district court that Mooneyham's brother had retained him to represent Mooneyham following the guilty verdict in his previous case. He indicated that Mooneyham had signed a contract with Kershaw and his associate, Mr. Leonard, on the same day that the motion to continue had been filed. In turn, Leonard told the district court that Mooneyham had not listened to all of the cassette tapes because Ricker had allowed him to listen to only a portion of the tapes. Leonard also wanted time to conduct neuropsychological testing because of an automobile accident in which Mooneyham had been injured in the months just before the drug sales in this case allegedly occurred.

In response, Ricker explained that he had listened to the tapes in their entirety, but had elected to share only the incriminating parts with his client, that he had watched portions of the

videotapes with Mooneyham, that Mooneyham did not ask to review the tapes in their entirety until after the conclusion of the first trial, and that he felt that his client was fully aware of the content of the tapes.  Ricker denied that he had represented the potential defense witness alluded to by Mooneyham, and he denied any conflict of interest.

For his part, attorney Kershaw told the district judge that he would not "feel comfortable going to trial tomorrow; but if you force us to go to trial tomorrow, we will."  He also indicated that he had yet to review the audiotapes and intended to contact a potential defense witness.  At no time did anyone at the hearing imply that Mooneyham had received less than adequate counsel.

In denying the motion for a continuance, the district court noted that Ricker had spent over 50 hours in preparation for the instant case and that his performance in Mooneyham's first trial was "above reproach."  It found that Mooneyham's entire complaint against Ricker was that he had not been allowed to listen to the eleven audio tapes in their entirety and that any dispute concerning the tapes was not so great as to result in a total lack of communication between attorney and client, preventing an adequate defense. Further, citing *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985), the district court found that Mooneyham's motion was an attempt to manipulate the trial, that a continuance would cause prejudice to the prosecution and create difficulties for the trial court based on its other scheduling needs, and that it would frustrate the public interest in the prompt and efficient administration of justice.  Accordingly, the court denied both the motion for a continuance and for substitution of counsel.

On appeal, Mooneyham reiterates essentially the same arguments that he raised before the district court, maintaining that he had "raised serious concerns which were not addressed."  He points to *Linton v. Perini*, 656 F.2d 207, 209 (6th Cir. 1981), for the proposition that "calendar control cannot supersede the trial judge's obligation to ensure that the defendant receives an adequate defense."  But, contrary to Mooneyham's assertion that the district court relied solely on "calendar control" in denying his motions, the record reflects that the district court heard full argument on the issue and considered all factors relevant to the "good cause" analysis as mandated by the law of this circuit.  We find no basis on which to find that the district court abused its discretion.

## 2.  Failure to Disclose Sealed Plea Agreement

Mooneyham next assigns error to the district court's decision in this case to permit Scott Walker to testify at trial, even though the defendant was not allowed to review the sealed plea agreement that Walker had entered with the government in his pending criminal case in a different district court.  On the stand, Walker testified that he had agreed to cooperate in Mooneyham's prosecution in exchange for a downward departure from his applicable sentencing range of 36-48 months, resulting in a sentence of 30 months.  On cross-examination, defense counsel elicited that, in addition, Walker had received "another downward departure" beyond that in the original agreement, resulting in an actual sentence of 21 months.  Mooneyham's attorney was in possession of this information because he had obtained a copy of the Rule 35 motion filed by the government to reduce Walker's sentence from 30 months to 21 months.

Despite the defendant's claim that the government violated its constitutional duty of disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to produce Walker's sealed plea agreement, we conclude that any error that might have resulted was harmless.  The underlying rationale of *Brady* is that due process is served when a defendant has access to evidence, including impeachment evidence, the suppression of which would deprive him of a fair trial.  Here, the defendant was well aware that Walker had cooperated with the government in order to obtain a reduction in his sentence, because defense counsel had obtained a copy of the Rule 35 Motion filed in Walker's case prior to trial.  Moreover, the government immediately sought on direct examination

to disclose the contents of Walker's plea agreement, and Mooneyham had the opportunity to cross-examine Walker fully, both on the basis of his sworn testimony on direct and on the basis of the information contained in the Rule 35 motion.

Hence, there is no evidence that the defense lost the opportunity to impeach Walker's testimony due to the fact that counsel did not have access to the plea agreement. As the government points out, the docket sheet in Walker's case reveals that the plea agreement was ordered unsealed in October 2004. Despite this, Mooneyham has not claimed with specificity that he was deprived of impeachment material based on the actual contents of the plea agreement. From all of this, we conclude that even if the sealed plea agreement did in fact constitute *Brady* material, the failure of the government to turn it over did not create a reasonable probability that the outcome of the trial would have been different. It follows that the district court did not abuse its discretion in allowing Walker to testify.

## 3. Failure to Declare a Mistrial

Finally, Mooneyham contends that the district court erred in permitting the prosecution to play a tape-recording for the jury that contained a hearsay statement. Although not completely clear from the brief filed on appeal, it appears that the statement in question was made by Walker while wearing a wire when, after the completion of one of the drug transactions with the defendant, he remarked to Agent Williams, "I got more than I got the other night." This and other statements extraneous to the actual drug-trafficking offenses were held to be hearsay by the magistrate judge during pre-trial proceedings, who granted the defendant's motion to exclude them.

When the tape recording was played at trial, however, defense counsel entered an objection, pointing out that he had heard the statement quoted above in violation of the order excluding it from evidence. After the jury was excused and the tape replayed, the prosecution agreed that the statement in question should have been redacted and pleaded inadvertence. The district judge responded, "I accept that it was inadvertent, I don't have any question about that and, frankly, I didn't understand what was said [on the tape]." The district judge then directed the government to prepare a redacted version of the tape, for possible use by the jury in deliberations, and denied the defendant's motion for a mistrial, later explaining its reasoning:

> Prior to the introduction of this tape, TBI Agent Jim Williams introduced into evidence a Lab Report and the cocaine from the May 21, 2002 sale, which established that this sale involved 0.3 grams of cocaine. In conjunction with the audio tape made on May 24, 2002, which contained the excluded statement, Agent Williams also introduced into evidence a Lab Report and the cocaine from the May 24, 2002 sale, which established that this transaction involved 0.5 grams of cocaine and 1.4 grams of methamphetamine. Therefore, the statement by Walker that he obtained more drugs on May 24 than he did on May 21 is merely cumulative to other evidence which established this fact which clearly was admissible.

We conclude, as did the district court, that the error in permitting the jury to hear the portion of the tape at issue was harmless error, at most. Although we can understand defense counsel's frustration at the incomplete redaction of the tape, we conclude that the declaration of a mistrial or the grant of a new trial on that basis of the objection would have been completely unwarranted.

## C. *Conclusion*

For the reasons set out above, we affirm the judgment of conviction entered by the district court in this case.

## III.  SENTENCING ISSUES

The district court consolidated Mooneyham's two cases for sentencing purposes and, thus, the issues raised on appeal in case number 04-5189 and case number 04-5190 are identical.  The defendant's three convictions in the former case and two convictions in the latter were grouped together under the sentencing guidelines, resulting in a base offense level of 26.  The quantity of cocaine was measured as at least 500 grams but less than two kilograms. Mooneyham's offense level was increased by two levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, as a result of his fugitive status between June 2002 and his arrest on July 1, 2003, which delayed the prosecution of the cases for over a year.  With a total offense level of 28 and a criminal history category of IV, the guideline range for imprisonment was 110 to 137 months.  However, Mooneyham was subject to a statutory mandatory minimum sentence of ten years, pursuant to 21 U.S.C. § 841(b)(1)(B), because of a prior felony drug conviction in 1998 and, thus, his applicable guideline range was effectively 120 to 137 months.

Mooneyham filed a notice indicating that he did not object to the presentence report and, based on the information contained in the report, the district court sentenced him to serve a term of imprisonment of 137 months.  In the absence of a contemporaneous objection to the sentencing procedure in the district court, we review the defendant's sentence for plain error only.  *See United States v. Olano*, 507 U.S. 725, 742 (1993) (Kennedy, J., concurring); *United States v. Oliver*, 397 F.3d 369, 377-78 (6th Cir. 2005).

We have recognized, in the wake of *Booker*, that a sentence imposed under mandatory guidelines, as was the pre-*Booker* sentence in this case, constitutes plain error where it "affects substantial rights" by prejudicing the defendant.  *See*, *e.g.*, *United States v. Webb*, 403 F.3d 373 (6th Cir. 2005).  We will presume prejudice in cases in which the district court could have imposed a lower sentence had it known that the guidelines should be applied on an advisory basis.  *See United States v. Barnett*, 398 F.3d 516, 527-29 (6th Cir. 2005).  This presumption of prejudice can be rebutted only in those rare cases where "the trial record contains clear and specific evidence that the district court would not have, in any event, sentenced the defendant to a lower sentence under an advisory Guidelines regime."  *Id*. at 529.

The government makes a persuasive argument that the record on appeal establishes this as the "rare case" in which a *Booker* remand is not required, given the comments by the district judge at the sentencing hearing:

> Your prior history and your prior conduct, especially as it relates to this case, doesn't give me any confidence that you are [sincere] . . . .  I'll recommend to the Bureau of Prisons that you serve this sentence at Lexington.  However, due to the nature and circumstances of the offenses involved here and the history and characteristics that I know apply to you, I think I have to impose a sentence here at the top of the range because of the seriousness of these offenses, and maybe more importantly in this case than most others to promote respect for the criminal justice system, which you certainly have not shown to this point.

But, however persuasive we may find the government's argument, we cannot say that the record is sufficient to overcome the presumption that Mooneyham's substantial rights were affected by the fact that he was sentenced under a mandatory guidelines scheme.

We find no merit to the defendant's remaining challenges to his sentence.  The district court applied the mandatory minimum of 120 months because, under 21 U.S.C. § 841(b)(1)(B), the defendant had a prior felony drug conviction.  Contrary to the defendant's insistence, nothing in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires that the fact of that prior conviction be

established on the record by independent evidence.  *See United States v. Bradley*, 400 F.3d 459, 462 (6th Cir. 2005) ("From *Apprendi* to *Blakely* to *Booker*, the Court has continued to except such factfinding [of prior criminal convictions] from the requirements of the Sixth Amendment.").  The defendant's challenge to the enhancement based on obstruction of justice likewise does not constitute plain error, in view of his failure to object to the facts recited in the presentence report and given that the record is replete with evidence that he absconded.

## IV.  CONCLUSION

For the reasons set out above, we AFFIRM the judgments of conviction entered by the district court in both cases and REMAND them to the district court for resentencing.