**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0224n.06
Filed: March 24, 2009

**Nos. 07-2390/07-2425**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| DAVELL CULBERSON and ZACK BROWN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: KEITH, SUTTON, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendants Davell Culberson and Zack Brown appeal their sentences for mail fraud, health care fraud, and conspiracy to commit mail and health care fraud, arguing that the district court improperly calculated the extent of their fraud, resulting in a higher sentencing range. Defendant Culberson also challenges the admission of recorded conversations between Brown and a former coconspirator. Because the district court did not clearly err in its sentencing calculations and did not abuse its discretion in admitting the recordings into evidence, we affirm.

I.

A jury in the United States District Court for the Eastern District of Michigan convicted defendants Davell Culberson and Zack Brown of fifty-three counts of mail fraud in violation of 18

U.S.C. § 1341, twenty-six counts of health care fraud in violation of 18 U.S.C. § 1347, and conspiracy to commit mail and heath care fraud in violation of 18 U.S.C. § 371. The convictions stemmed from a scheme whereby defendants would bill Blue Cross Blue Shield of Michigan ("BCBSM") for physical therapy that was not actually provided to patients.

Brown, a medical doctor, operated a medical clinic in Detroit and employed Culberson as his biller. The two of them, along with a number of Brown's patients, repeatedly defrauded BCBSM by submitting false invoices requesting payment for services that Brown had not rendered. BCBSM "departicipated" Brown in 1996 for engaging in suspicious billing practices and would no longer send checks directly to him. Thereafter, BCBSM would only send checks directly to its subscribers. As a result, Brown needed assistance to continue the scheme and recruited more than thirty-four BCBSM subscribers to act as his fraudulent "patients." Brown would bill BCBSM for medical services that he did not actually provide for these "patients," BCBSM would send the patients a check, and the patients would then give the check to Brown who would pay them a commission. Brown and Culberson engaged in approximately 76,000 of these fraudulent transactions.

BCBSM investigators and the FBI contacted Vanessa Gray, one of Brown's false patients, who ultimately admitted her role in the scheme and agreed to cooperate with them by recording conversations between herself and Brown. During the course of nine recorded conversations, Brown made a number of statements implicating himself and Culberson. These recordings were played for the jury over Culberson's objection.

At the sentencing hearing, the district court sentenced Brown to 60 months for the conspiracy conviction, 200 months for mail fraud, and 120 months for health care fraud, all to be served concurrently. The district court granted Culberson a downward variance, sentencing him to a 36-month term on each of the 80 counts, to be served concurrently.

For sentencing purposes, the government analyzed the fraudulent claims by separating them into five tiers. Tier 1 consisted of the twenty-six convictions for health care fraud, totaling $788,864. Tier 2 included other false claims involving the same fraudulent practices that led to the Tier 1 convictions and were confirmed to be false by the Tier 2 patients. These claims totaled $750,604. Tier 3 consisted of additional false claims that were submitted in the same manner as those claims in Tier 1 and Tier 2, but six of the Tier 3 patients denied that the claims were false, and fifty-two of the Tier 3 patients were not interviewed. Tier 3 claims amounted to $810,388. Tier 4 involved the same fraudulent activity that comprised the other tiers but included claims that were submitted to Medicare for which BCBSM provided supplemental coverage. Tier 4 amounted to $748,453. Tier 5 involved fraudulent claims that were sent only to Medicare and totaled $255,432.

The district court rejected Tier 3, but accepted the others. This left a total of $2,543,353, of which the court found the defendants to be jointly and severally liable for restitution in the amount of $1,130,466.54. Defendants timely appealed.

II.

Both defendants argue that the district court erred in its calculation of loss for purposes of

sentencing. The district court found that the amount of the intended loss was the total amount that

defendants fraudulently billed:

> [T]he preponderance of the evidence has shown that the loss, the intended loss here is the amount which was billed to Blue Cross, not the amount that the doctors or the biller anticipated he would receive. This is a fraud complaint. What is fraudulently being submitted is the maximum amount billed.
>
> The Court is aware that doctors do bill more than what they think they will receive. Some of 'em, depending upon their relationship with Blue Cross, can get that money from the patient. Others do it, as I have heard testimony in other cases, so that ultimately Blue Cross will raise the amount that they pay for a particular service. So that is in fact an intended loss.

The court concluded that the total intended loss was a little over $2.5 million and that the actual loss

for which defendants owed restitution was $1,130,466.55.

When calculating loss for purposes of the Sentencing Guidelines, the district court is required

to find the loss amount by a preponderance of the evidence, and the district court's findings cannot

be overturned unless they are clearly erroneous. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir.

2006) (citing *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998)). The question of

whether the facts found by the district court merit a particular Guidelines provision is a question of

law that we review de novo. *Id*.

## A.

The district court determined that Brown's base offense level was seven. The court then

added eighteen levels because the amount of loss exceeded $2,500,000 but was less than $7,000,000,

an additional four levels because he was "the organizer and leader of a conspiracy," two levels

because he abused a position of trust, and two levels for obstruction of justice, resulting in an adjusted offense level of thirty-three. Brown's criminal history category was IV, creating a Guidelines range of 188-235 months. The district court sentenced Brown to 60 months for the conspiracy conviction, 200 months for mail fraud, and 120 months for health care fraud, all to be served concurrently, along with restitution.

Brown argues that "for purposes of determining the loss figure, the amounts billed should not be used, because no one – neither BCBSM nor Medicare nor defendant nor the patients – expected the full amount billed by the doctor to be paid." Brown cites *Triana* as an example of the Sixth Circuit affirming a district court's sentencing calculations based on actual loss instead of intended loss. However, in *Triana*, the government did not appeal the district court's calculation. Furthermore, our tacit acceptance in a previous case of a loss calculation based on actual, rather than intended, loss does not mean that a district court would have committed clear error by ruling otherwise.

A comment to the Guidelines states that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 n.3(A). Brown concedes that the "punishment for fraud is determined in large part upon what the defendant attempted to obtain." The district court found that the best evidence of what Brown "attempted to obtain" was the fraudulent bills that he submitted to BCBSM. At Brown's sentencing hearing, Brown's counsel argued that Brown did not expect to receive the entire amount billed. But he offered no evidence to support that assertion. Brown never testified about his own intent or offered evidence showing that he knew what amounts BCBSM was likely to pay

out. Because he failed to do so, the district court did not clearly err in finding that the bills represented the amount that Brown hoped to obtain. *See United States v. Miller*, 316 F.3d 495, 504-05 (4th Cir. 2003). We therefore affirm the district court's loss calculations.

B.

The district court determined that Culberson's base offense level was seven. The court added eighteen levels because of the amount of loss, for a total offense level of twenty-five. The probation office determined that Culberson had a Criminal History Level III, but the district court believed that this overstated his criminal background. The court ultimately varied downward and issued a sentence of thirty-six months on each of the eighty counts, to be served concurrently, along with restitution.

Culberson makes a similar, but more specific, argument than Brown regarding the calculation of loss. Culberson argues that he should only have been held responsible for the Tier 1 fraud charges of $788,864 and, for purposes of restitution, should only be required to pay for the $308,695.41 actually expended by BCBSM. In other words, Culberson makes two arguments related to calculation of loss: (1) he should only have to pay the actual amount of loss, not the amount billed, and (2) of the amount billed, he is only responsible for $788,864, not the full $2,543,353. His first argument fails because, as we described above in relation to Brown, the district court did not clearly err in calculating loss based upon the intended loss rather than the actual loss.

Culberson's second argument is that the district court erred in holding him responsible for anything other than the Tier 1 losses. He argues that the district court violated his Fifth and Sixth

Amendment rights by finding him "accountable for uncharged and unproven fraudulent conduct not presented to the jury which convicted him." Culberson acknowledges that "the Sixth Circuit as well as all other circuits agree that relevant conduct can include uncharged criminal acts" but requests that "the Sixth Circuit revisit, reconsider and overrule its previous decisions on this issue."

We are not permitted to accept this invitation because a Sixth Circuit panel does not have the authority to overrule the decision of another panel. The "'prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001)). By including this argument in his brief, Culberson has preserved the issue for a possible en banc appeal, but this panel is bound by prior precedent which permits the use of uncharged conduct in sentencing.

Alternatively, Culberson argues that the district court clearly erred by including in the loss calculation those claims in Tier 4 that were submitted on behalf of the forty-three patients the government did not interview. We disagree. In situations where the total loss is not easy to quantify, sentencing courts "need only make a reasonable estimation of loss." U.S.S.G. § 2B1.1, n.3(C). As the district court explained, all the claims in Tier 4 were submitted pursuant to the same particular and regular billing pattern by which the claims in Tiers 1, 2, and 5 were submitted. Moreover, all of the nineteen Tier 4 patients that the government did interview admitted that the claims submitted on their behalf were fraudulent, and four more Tier 4 patients were tied to the conspiracy by other

recruiter-patients.  In light of this evidence, we cannot say that the district court clearly erred by including all the Tier 4 claims in the loss calculation.

III.

Culberson also argues that the district court erred in admitting the taped conversations between Gray and Brown.  Specifically, Culberson asserts that the tapes were inadmissible under FED. R. EVID. 801(d)(2)(E) and that the admission of them violated the Confrontation Clause of the Sixth Amendment.

Rule 801(d)(2)(E) states that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is excluded from the hearsay rule.  Culberson argues that Gray's recordings were not admissible against him because "she had already withdrawn from the conspiracy."  However, the rule does not require that both parties be co-conspirators; it merely requires the statement to be "offered against a party" and be made by "a coconspirator of a party during the course and in furtherance of the conspiracy."

Courts have consistently allowed the admission of testimony against a defendant made by the defendant's coconspirator to a government agent.  For example, in *United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007), we affirmed the admission of a statement made by Mooneyham's coconspirator to an undercover officer because the admission was made "in furtherance of the conspiracy." *Id.*; *see also Bourjaily v. United States*, 483 U.S. 171, 180 (1987) ("We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy.").  In

the instant case, the district court reviewed the statements and found that "it's clear from the transcript that Dr. Brown believed Vanessa Gray was still participating in whatever was going on. And because of that, the Court finds that this was in furtherance of the conspiracy and can come in against all parties." Culberson has not shown that the district court abused its discretion in making this finding.

Culberson argues further that the admission of these recordings violates the Sixth Amendment's Confrontation Clause. The threshold question is whether the recordings were "testimonial" in nature. If the statements are testimonial, then "the government must demonstrate that the declarant is unavailable to serve as a witness, and that the defendant had a prior opportunity to cross-examine the declarant." *Mooneyham*, 473 F.3d at 286 (citing *Crawford v. Washington*, 541 U.S. 36, 54-55 (2004)). However, statements made by coconspirators in furtherance of the conspiracy are not testimonial. "By definition, such statements are not by their nature testimonial . . . .'" *Id*.; *see also Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Brown's statements to Gray were not made with the expectation that they would be used in court; they were made with the expectation that Gray would continue to assist him with the conspiracy. Therefore, the district court properly ruled that the statements were nontestimonial and thus outside of the scope of the Confrontation Clause.

IV.

For the reasons stated above, we affirm the judgment of the district court.