**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0605n.06
Filed: October 8, 2008

**Nos. 07-1368, 07-1672**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


UNITED STATES OF AMERICA　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff-Appellee,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　ON APPEAL FROM THE UNITED
　　　　　　　　　　　　　　　　　　　)　STATES DISTRICT COURT FOR THE
DARRELL A. MITCHELL,　　　　　　　)　WESTERN DISTRICT OF MICHIGAN
　　　　　　　　　　　　　　　　　　　)
　　　　Defendant-Appellant,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
MARCUS LOFTON,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendant-Appellant.　　　　　)


Before: MARTIN, ROGERS, and SUTTON, Circuit Judges


SUTTON, Circuit Judge. Darrell Mitchell and Marcus Lofton appeal their sentences for taking part in a multi-year drug-distribution conspiracy. We affirm.


I.


From at least 1998 to 2004, Mitchell, Lofton and a number of other individuals conspired to buy and sell drugs in the Grand Rapids area. The conspiracy consisted of a largely decentralized web of transactional relationships among the conspirators, ranging from steady streams of sales to individual ad hoc purchases. Although they dabbled in other drugs, the conspirators focused on

cocaine: A few of the conspirators regularly purchased large quantities of powder cocaine from outside sources, then resold it to others within the conspiracy, who in turn resold it to other dealers or end-users. Along the way, they converted (or "cook[ed]") much of the powder into cocaine base (crack). JA 297, 343–44, 355–57, 367.

A grand jury indicted Mitchell, Lofton and nine other coconspirators in 2003 and 2004, ultimately charging Mitchell and Lofton with conspiracy both to possess with intent to distribute and to distribute five kilograms of powder cocaine, 50 grams of crack cocaine and an unstated amount of marijuana. Mitchell and Lofton pleaded guilty to the main conspiracy count.

After hearing a number of Mitchell's coconspirators testify at his sentencing hearing, the district court sentenced Mitchell to 360 months' imprisonment. After holding a separate evidentiary hearing concerning Lofton's role in the conspiracy, the court sentenced Lofton to 240 months. Mitchell and Lofton each appealed their sentences.

II.

Mitchell challenges the district court's (1) calculation of the quantity of drugs for which he should be held responsible and (2) enhancement for managing or supervising a conspiracy.

A.

Mitchell argues that the district court treated a large portion of the *powder* cocaine he handled as if it were *crack* cocaine without sufficient evidence and without articulating any specific "conversion ratio." Br. at 10. While it is debatable whether Mitchell raised this argument below, we assume (without deciding) that he did preserve it, as it fails on the merits in any event.

Although the vast majority of the cocaine Mitchell sold to other coconspirators remained in powder form at the time of the transactions, the district court properly treated at least some of that powder as crack. The base-offense level for Mitchell's conspiracy charge hinged on the aggregate amounts of the various drugs attributable to his conduct, *see* U.S.S.G. § 2D1.1(a)(3), (c), requiring the district court to "approximate the quantity of the controlled substance[s]" involved in his drug-distribution activities, *id.* § 2D1.1 note 12. When making this calculation in the context of "jointly undertaken criminal activity," the guidelines require the district court to look beyond Mitchell's own actions and take account of "all reasonably foreseeable acts and omissions of others in furtherance" of the conspirators' operations. *Id.* § 1B1.3(a)(1)(B). And "it is appropriate to convert powdered cocaine into cocaine base for sentencing purposes, if facts show that an object of the conspiracy was to convert powder to crack." *United States v. Bingham*, 81 F.3d 617, 628 (6th Cir. 1996). As the district court properly recognized, the conspiracy's primary objective was to make and distribute crack cocaine, making Mitchell responsible for the reasonably foreseeable amounts of crack his coconspirators made and distributed from the powder he sold them.

Mitchell does not dispute the district court's prerogative to treat powder as crack for calculation purposes. He instead argues that the court did so in a slipshod way. Relying on the Seventh Circuit's decision in *United States v. Stott*, 245 F.3d 890 (7th Cir. 2001), Mitchell contends that the district court counted nearly all of the powder as crack without adequately identifying which portions of the powder that passed through his hands foreseeably became crack down the line and without determining precisely how much crack each unit of the powder he sold yielded.

We disagree. In the first place, the district court based its determination of the amounts of powder Mitchell's customers converted to crack on adequate evidence presented at the sentencing hearing. The government's witnesses testified to the specific amounts of powder they each purchased from Mitchell. And their accounts established that Mitchell knew each buyer was transforming that powder into crack, and indeed in one instance Mitchell asked his primary supplier how well his powder performed in the crack-cooking process.

Relying on this testimony and conservatively calculating the amounts involved in each transaction, the district court found Mitchell responsible for 4.710 kilograms of powder, most of which, it found, his customers converted to crack. Not every gram Mitchell sold, the court acknowledged, "was necessarily turned into crack," but the vast majority of it was, JA 436, and this amount easily exceeded the threshold amount (1.5 kilograms) required to place Mitchell in the then-highest base-offense bracket, *see* U.S.S.G. 2D1.1(c)(1); *cf. Bingham*, 81 F.3d at 625–28. Given the evidence the government presented and the careful analysis the district court undertook, the court's work did not amount to "impermissible speculation" or "calculat[ing] drug amounts by guesswork."

- 4 -

*Stott*, 245 F.3d at 911–12 (internal quotation marks omitted); *United States v. Chisholm*, 73 F.3d 304, 308 (11th Cir. 1996).

In the second place, the district court adequately accounted for the amount of powder lost in the cooking process. Even though Mitchell's counsel frequently failed to raise the conversion-ratio issue when cross-examining the government's witnesses, the court itself asked several of Mitchell's customers about the amount of crack yielded from the purchased powder cocaine. All but one said Mitchell's powder produced an equal weight of crack, and the one testified that ten ounces of Mitchell's powder yielded "[n]ine, ten [ounces], something like that." JA 353. The court nonetheless discounted the *entire* crack quantity by 10% (from 4.710 kilograms to 4.239 kilograms) to account for any weight lost. Far from being "random" and "arbitrary," Br. at 12, the court's ten-to-nine conversion ratio gave Mitchell the benefit of the doubt.

B.

Also unavailing is Mitchell's argument that the district court improperly applied a 3-level enhancement for his role as a "manager or supervisor" in the conspiracy. U.S.S.G. § 3B1.1(b). To qualify for a § 3B1.1(b) enhancement, Mitchell "must have been the . . . manager[] or supervisor of one or more other participants." U.S.S.G. § 3B1.1 note 2. The "participants" he managed or supervised, importantly, need not have been convicted or even charged so long as they were "aware of the criminal objective" and "knowingly offered their assistance." *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002). Coordinating even a single delivery of drugs via a courier suffices

to constitute "management." *See United States v. Munoz*, 233 F.3d 410, 416 (6th Cir. 2000); *cf.* *United States v. Rivera*, 527 F.3d 891, 909 (9th Cir. 2008).

Mitchell's activities fall within these requirements. Victoria Vinson, Mitchell's girlfriend, delivered drugs to others several times at Mitchell's request. Mitchell also sent others (including Lofton) to make deliveries for him and on at least one occasion arranged for buyers to pick up drugs from his own brother. In responding that he never "controlled" or "coerc[ed]" anyone's assistance in his drug-trafficking endeavors, Br. at 13–14, Mitchell misapprehends the § 3B1.1(b) standard. "Such control or authority over others [that] is required to impose the four-level enhancement under [§] 3B1.1(a)"—which the government sought here but the district court declined to impose—"is precisely what distinguishes a leader or an organizer under § 3B1.1(a) from a manager or supervisor under § 3B1.1(b)," *Rivera*, 527 F.3d at 908 (internal quotation marks omitted); *cf.* U.S.S.G. § 3B1.1 note 4.

## III.

Lofton argues that the district court (1) made several mistakes in calculating his drug quantities, (2) improperly credited perjured testimony, (3) failed to consider one of his arguments and (4) gave disproportionate weight to his criminal history.

A.

In challenging the court's drug-quantity calculation, Lofton points to three alleged mistakes: it counted as crack 4.5 ounces of powder that Lofton helped another coconspirator purchase; it attributed 765.45 grams of powder to him without any support in the record; and it erred in translating Lofton's powder cocaine total into equivalent units of marijuana.

Because Lofton did not preserve these objections in the district court, we review his contention only for plain error, *see United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc), which is fatal to his claim. As Lofton concedes, all three errors taken together made no difference to his guidelines range. That concession by itself establishes that the alleged errors were harmless. *See United States v. Charles*, 138 F.3d 257, 268 (6th Cir. 1998); *United States v. Hettinger*, 242 F. App'x 287, 296 (6th Cir. June 18, 2007). And that concession necessarily shows that he cannot meet the requirements of plain-error review because it precludes him from showing that the alleged errors affected the outcome of the sentencing proceeding. *See United States v. Barnett*, 398 F.3d 516, 526 (6th Cir. 2005); *see also United States v. Olano*, 507 U.S. 725, 734 (1993) (in establishing plain error, unlike harmless error, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice"). All Lofton offers is his own conjecture that a lower drug-quantity finding "could certainly have affected the court's decision on sentencing." Br. at 9. Perhaps. But it is just as plausible that correcting the alleged mistakes would not have affected his sentence, based as it was on the court's "conservative" drug-quantity estimates, which were far below those recommended by the presentence investigation report. JA 626. "Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of

showing that the error actually affected his substantial rights." *Jones v. United States*, 527 U.S. 373, 394–95 (1999).

B.

Lofton next argues that the district court relied on the perjured testimony of three witnesses—Jermaine McGhee, Kengie Gates and Howard Mayfield. McGhee testified that he purchased 4.5 ounces of crack from Lofton three or more times beginning in 1997. But that was not credible, Lofton argues, because McGhee told a grand jury in 2004 that he bought only *powder* from Lofton. That grand-jury testimony is not in the record, but as McGhee explained at Lofton's sentencing, he initially purchased crack from Lofton but then switched to powder because Lofton's crack contained too much cutting agent, a story that appears consistent with the portions of McGhee's grand-jury testimony read aloud at Lofton's sentencing. Similarly, McGhee's various accounts of the amounts of *powder* he purchased from Lofton, though not identical, hardly present the kinds of "clear[]" inconsistencies that compel us to cast aside the district court's credibility assessment. *United States v. Roche*, 321 F.3d 607, 611 (6th Cir. 2003).

Lofton's attack on Gates' credibility meets the same fate. Lofton tried to impeach Gates' statement that he sold powder to Lofton in 2003 with prior plea-hearing testimony to the effect that he sold "drugs" only to a single person, Lorenzo Webb, identified on a list of names given to him. JA 536–37. But the impeachment effort at sentencing lost momentum when Gates himself, after being shown a transcript of his prior testimony, observed that it was unclear (at least from the

transcript) what list he had been looking at, and when he clarified that Webb was the only person to whom he had sold *crack*. On this record, the district court could have disbelieved Gates' version of events, but its decision to credit his testimony was not so obviously mistaken as to warrant displacing its judgment with our own.

The same is true of Mayfield's credibility. Lofton noted that his presentence investigation report indicated that Mayfield told investigators he regularly purchased crack from Lofton in the second half of 2003 (during part of which he was in custody), undercutting his testimony at Lofton's sentencing that he bought crack from Lofton in 2002. Mayfield insisted that the report was mistaken, and the prosecutor told the court that Mayfield had raised the same issue the first time he saw the report in a prior meeting with investigators. Here again, the district court did not have to believe Mayfield—indeed, it did not credit his testimony on a different issue in a prior proceeding—but Lofton has identified no clear error in crediting his testimony on these issues.

C.

Lofton next contends that the district court committed procedural error by failing adequately to consider his argument that it should vary from the 100:1 crack-powder ratio embodied in the guidelines. As a threshold matter, Lofton passed up the most obvious opportunity to object to the inadequate attention the district court gave his argument: When given the chance at the end of the sentencing to raise any objections, Lofton's counsel neither indicated that the court had failed to

address his crack-powder-disparity argument nor asked for further explanation. As a result, Lofton faces plain-error review. *See Vonner*, 516 F.3d at 386.

Lofton, to begin with, overstates the district court's obligation to address his argument in detail. District courts need not explicitly address every argument a defendant raises at sentencing. *See United States v. Smith*, 510 F.3d 603, 608 (6th Cir. 2007). They retain considerable latitude in deciding which arguments to discuss and how much explanation is necessary. So long as "[t]he record makes clear that the sentencing judge listened to each argument," "considered the supporting evidence," was "fully aware" of the defendant's circumstances and "took them into account" in sentencing him, the sentencing court has done its duty. *Rita v. United States*, __ U.S. __, 127 S. Ct. 2456, 2469 (2007).

As the record reflects, the district court fulfilled its obligation to consider Lofton's argument that the 100:1 ratio should not apply in his case. After noting that it had read Lofton's sentencing memorandum in which he raised this argument, the court went on to reject it at the hearing, explaining that the 100:1 ratio reflected a policy judgment about the violence associated with crack, that the ratio had been applied to Lofton's coconspirators and that the court had been given "no reason not to [apply] it here." JA 621. At the same time, the court expressly acknowledged its authority to vary from the advisory guidelines' recommended range. No plain error occurred.

D.

Lofton next argues that in imposing his sentence, the district court gave disproportionate weight to his prior convictions. The district court calculated Lofton's criminal-history score to be 15 points, placing him in Category VI. Lofton did not object to this calculation, but he did argue that the district court should depart downward to criminal-history Category V (as the presentence report recommended) on the ground that a substantial number of Lofton's points (seven of his twelve prior-conviction points) arose from convictions for driving with a suspended (or expired) license, which Lofton said "over-represent[ed] the likelihood of recidivism," JA 473. Although he concedes that the guidelines calculations in this respect were accurate, he maintains that the resulting sentence was unreasonable. While we do not generally review a district court's decision not to grant a downward departure where the district court appreciated its discretion to do so, we do assess the reasonableness of the resulting sentence. *See United States v. Heath*, 525 F.3d 451, 459 (6th Cir. 2008). And because Lofton's 240-month sentence fell within the advisory guidelines range, it is entitled on appeal to a presumption of reasonableness. *See United States v. Duane*, 533 F.3d 441, 453 (6th Cir. 2008).

Lofton offers nothing meaningful to rebut that presumption. Nor does the record suggest the district court abused its discretion in determining his final sentence. The court took account of the serious nature of the drug-trafficking conspiracy and Lofton's role in it, the need for adequate punishment and the need to avoid serious sentencing disparities with other similar defendants. And with respect to Lofton's criminal history (which the district court described as "outrageous," JA

611), the court noted that although a number of his prior convictions were for driving-license-related offenses, he had several other convictions that resulted in no points—to say nothing of a number of other charges that were dismissed in exchange for guilty pleas. These prior convictions, the court noted, "show a scofflaw attitude," as they reflect "repeated violations of the same nature, which are the easiest ones to change." JA 613. Lofton gives us no reason to reject this conclusion or any other aspect of the district court's assessment, and in the end "we simply cannot say that [his] special circumstances are special enough that, in light of § 3553(a), they require a sentence lower than the sentence the Guidelines provide." *Rita*, 127 S. Ct. at 2470.

IV.

For these reasons, we affirm.