**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0475n.06

Case No. 19-2300

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 11, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CHAKA LECHAR CASTRO, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SUTTON, KETHLEDGE, and LARSEN, Circuit Judges.

PER CURIAM. Chaka Castro organized a series of armed invasions into the homes of Indian and Chinese families. In the last appeal, we held that the evidence taken from Castro's phones was fair game at trial. 881 F.3d 961 (6th Cir. 2018). On remand, a jury found Castro guilty on all nine counts before it. The jury also found that she chose at least one of her victims based on race, prompting the court to apply a hate-crime enhancement. Castro claims that the evidence doesn't support the verdict and the hate-crime enhancement doesn't apply. We affirm.

Over a three-day period in November 2014, a spate of robberies occurred in Ann Arbor. The crimes fit a pattern. The robbers broke into the home, rounded up the occupants at gunpoint, and bound them with duct tape. Then they searched the home for jewelry and cash, taking what they found. Each house was home to persons of Indian or Chinese descent.

Similar robberies hit "twenty something" homes in New Jersey, New York, Georgia, Michigan, and Texas. R. 378 at 71. The other home invasions followed the pattern of the Ann Arbor robberies in how they happened and who the victims were.

On December 7, police interrupted a similar robbery attempt in Dallas. The robbers fled on foot. Later that day, police arrested Juan Fernando Olaya after finding him in a stolen vehicle with a suspected accomplice. The police inventoried the vehicle's contents and took custody of a cell phone, which contained potentially incriminating evidence. 881 F.3d at 963–64.

Although Castro was not present at the robberies, Texas officers came to suspect that she organized them. The officers followed a signal coming from a stolen cell phone to a house where Castro lived. They watched the home, searched it twice, and found a notebook that contained several pages of addresses, many of which had been robbed. Officers also received warrants for, and searched, two of Castro's cell phones. The cell-phone searches uncovered incriminating messages between Castro and Olaya as well as pictures of stolen jewelry.

The federal government charged Castro with violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), four counts of assault with a deadly weapon in aid of racketeering, *id.* § 1959(a)(3), and four counts of using a firearm in connection with a crime of violence, *id.* § 924(c). After our court concluded that the cell-phone evidence was admissible, the case proceeded to trial. The jury convicted her on all nine counts. At sentencing, the district court imposed a hate-crime adjustment and sentenced Castro to a 444-month prison term, with 336 months coming from the statutory minimum on the firearms offenses.

Castro first challenges the sufficiency of the evidence to support her firearms convictions. That calls us to examine "the evidence in the light most favorable to the prosecution," asking

whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The firearms statute applies to "any person who, during and in relation to any crime of violence . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(a). The government charged Castro with aiding and abetting a violation of the statute because she organized the armed home invasions. *See id.* § 2(a).

*Rosemond v. United States*, 572 U.S. 65 (2014), spells out the proof needed for the intent element of aiding and abetting. "[I]ntent must go to the specific and entire crime charged"—"the full scope (predicate crime plus gun use) of § 924(c)." *Id.* at 76. An accomplice thus must have "advance knowledge" that a firearm will be used in connection with the underlying crime because she must "cho[ose] . . . to align [her]self with the illegal scheme in its entirety— including its use of a firearm." *Id.* at 78. As usual, "knowledge can be inferred from circumstantial evidence." *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994). "[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate," the Supreme Court has explained, "the jury can permissibly infer from his failure to object or withdraw that he had such knowledge." *Rosemond*, 572 U.S. at 78 & n.9.

The incriminating light cast by Castro's serial home invasions allowed the jury to infer that she had advance knowledge firearms would be used in connection with the robberies that happened in November 2014. To start, Castro organized a similar series of home invasions in 2011. When police nabbed the robbers, she posted on Facebook that all eight members of her 2011 crew had been charged with "[a]rmed robbery," R. 381 at 118, showing she knew that firearms played a role in the robberies she organized. In addition, in August 2014, Olaya sent her a picture of stolen jewelry, which included the view of a semi-automatic pistol. On top of all

that, after the September and October robberies in New York and New Jersey, Castro kept the crew honest about what it stole by accessing police reports on the crimes. These reports typically contained information about the robbers' use of firearms. All in all, because the November 2014 home invasions followed a similar pattern to the earlier ones, the jury could infer that Castro knew they would involve firearms too. That suffices to support the firearms convictions. *United States v. Gooch*, 850 F.3d 285, 289 (6th Cir. 2017); *see Rosemond*, 572 U.S. at 78 & n.9.

Castro insists that there was no direct evidence that she knew that firearms would be used. True enough. "But," as noted, "knowledge can be inferred from circumstantial evidence." *Staples*, 511 U.S. at 615 n.11. And there was plenty of that here based on the earlier home invasions.

She also takes issue with the government's reliance on the photograph with the gun in it, noting that the gun is too hard to see to allow the jury to infer anything from it. This was a fact question for the jury to resolve. It saw the evidence, and it heard this exact argument at closing. But it still found Castro guilty. That was the jury's call to make, particularly in light of all the other evidence supporting the verdict.

She also questions the government's (and our) reliance on *Gooch*, 850 F.3d 285, claiming the decision is distinguishable. There we said that "participation in the two prior armed robberies with most of the same codefendants is strong circumstantial evidence that [the defendant] was aware of the group's modus operandi of using firearms in the commission of robberies." *Id.* at 289. Even so, she points out, the 2011 and 2014 crews involved different team members, and (unlike Gooch) she never witnessed her codefendants use a firearm. But what mattered in *Gooch* was that the crew followed a pattern of using firearms and Gooch had reason

to know about this pattern. Just so here. Castro organized dozens of robberies involving guns and had a habit of keeping a close eye on the robbers, whom she suspected of stealing from her. That's reason enough to think that she was aware of her crew's pattern of using guns in the robberies.

She adds that, according to some testimony, the robbers never discussed the reason for carrying firearms among themselves. She believes that their silence about firearms undermines the theory that their use was reasonably foreseeable. But the argument backfires because the same conspirator who testified that no one told him why he needed to carry a firearm explained to the jury that the reason for having one was to ensure that occupants would cooperate. That he made this connection on his own buttresses rather than undermines the jury's finding that the use of the firearms was reasonably foreseeable.

Castro also challenges the court's application of the "Hate Crime Motivation" adjustment. The adjustment applies when the jury "determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person." U.S.S.G. § 3A1.1(a).

But any error on this issue could not have changed Castro's guidelines range. Even without the three-point addition, Castro's total offense level would have been 39. With her criminal history category (IV), an offense level of 39 would have triggered an identical guidelines range to the one that she received: 360 months to life imprisonment. Because the three-point addition made no difference to her guidelines range, any supposed error would have been harmless error. *See United States v. Charles*, 138 F.3d 257, 268 (6th Cir. 1998); *see also United States v. Mitchell*, 295 F. App'x 799, 803 (6th Cir. 2008). Castro has no response to the

point, and indeed she offered no response to the government's harmless-error argument in her reply brief on appeal.

We affirm.